UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IVAMAE GREEN, individually and as parent and
natural guardian of FITZROY BARNES, FATIMA
BARNES, and EUSTACE BARNES, infants,

                       Plaintiffs,

      -v-

THE CITY OF MOUNT VERNON, SGT. SCOTT
GLENN, SGT. CHRIS GALLAGHER, RICHARD
FOX, MICHAEL KUSHNER, LEONARD
COOPLER, EUGENE WILSON, RICHARD
AZRON, JARED KMIOTEK, and JANE DOE, said
name being fictitious,

                       Defendants.

Case No. 10-CV-707 (KMK)

OPINION & ORDER

---

Appearances:

Andrew C. Risoli, Esq.
Eastchester, NY
*Counsel for Plaintiffs*

Hina Sherwani, Esq.
Joana Helen Aggrey, Esq.
City of Mount Vernon Corporation Counsel
Mt. Vernon, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

      Plaintiffs Ivamae Green ("Green"), Fitzroy Barnes, Fatima Barnes, and Eustace Barnes

(collectively, "Plaintiffs")[1] bring this Action under 42 U.S.C. § 1983 and New York State law,

---

[1] The caption states "IVAMAE GREEN, Individually and as Parent and Natural Guardian of FITZROY BARNES, FATIMA BARNES, and EUSTACE BARNES, Infants, Plaintiffs." At various points in the Fourth Amended Complaint, the pleadings refer alternatively to "Plaintiff" and "Plaintiffs." Thus, it is unclear if there is one Plaintiff—Green—or if there are four Plaintiffs—Green and her three children. At a December 6, 2012 conference, the Court requested that Plaintiffs' counsel clarify this issue, (Pls.' Aff'n in Opp'n to Mot. ("Risoli Aff'n")

alleging that Defendants Sergeant Glenn Scott ("Scott"), Sergeant Chris Gallagher ("Gallagher"), Richard Fox ("Fox"), Michael Kushner ("Kushner"), Leonard Cooper ("Cooper"),[2] Eugene Wilson ("Wilson"), Richard Azron ("Azron"), Jared Kmiotek ("Kmiotek"), Jane Doe a/ka Jean Jerome ("Jane Doe") (collectively, the "Police Officer Defendants"), and the City of Mount Vernon ("Mount Vernon") violated the U.S. Constitution and committed a number of state torts. Defendants move to dismiss all claims.  For the following reasons, the Motion is granted in part and denied in part.

I.  Background

A.  Factual Background

The following facts are drawn from Plaintiffs' Fourth Amended Complaint ("FAC"), and certain documents the Parties submitted that the Court considers, as explained below, and are taken as true for the purpose of resolving the instant Motion.  This action arises out of a search of Plaintiffs' home that occurred on June 3, 2009 at approximately 10:30 p.m. pursuant to a search warrant that relied in part on information from a confidential informant ("CI") and that identified two people allegedly involved in the sale of cocaine.  (*See* Fourth Am. Compl. ("FAC") ¶ 10 (Dkt. No. 47).)  At the time of the search, Green was "home in her apartment with her three infant children."  (*Id.*)  Scott, Fox, and Kushner, acting "with a purported[ly] valid search warrant," broke down the door to Plaintiffs' apartment "without any prior warning," entered the apartment with guns drawn, and "threatened bodily harm" to Plaintiffs if they did not comply with police demands.  (*Id.*; *see also id.* ¶ 27 (alleging that Scott, Fox, and Kmiotek "intentionally

_____

Ex. D, at 25 (Dkt. No. 56)), but he did not do so.  The Court's reading of the pleadings is that Green intended for her children to be Plaintiffs in this case.

[2] While the caption of the Fourth Amended Complaint ("FAC") calls this Defendant "Coopler," the allegations in the FAC call him "Cooper."

placed [Plaintiffs] in fear of imminent harm or contact" when they drew their guns, pointed the

guns at all three Plaintiffs, and threatened them with immediate harm (internal quotation marks

omitted)).)  Scott, Fox, and Kushner then "handcuffed and arrested" Green and separated her

from her children.  (*Id.* ¶ 10.)  Plaintiffs allege that the Police Officer Defendants "intended to

confine Plaintiffs," that "Plaintiffs objected to and were conscious of the confinement at gun

point," and that the confinement "was not privileged" because the search warrant was invalid.

(*Id.* ¶ 49.)

    After Green was handcuffed, Cooper, Wilson, Azron, Kmiotek, Jane Doe, and McKennie

entered the apartment.  (*Id.* ¶ 10.)  Plaintiffs allege that McKennie forced Green to strip off all of

her clothing, and that Jane Doe and McKennie performed two vaginal searches of Plaintiff.  (*Id.*

¶ 10.)[3]  Plaintiffs allege that Jane Doe and McKennie "completely ransacked Plaintiff[s']

apartment[,] destroying much of [their] property[.]"  (*Id.*)  Furthermore, Plaintiffs allege that the

Police Officer Defendants searched Green's apartment, but did not find drugs or either of the two

individuals described in the search warrant.  (*Id.*)

    Plaintiffs allege that "[d]uring the search," Scott told Green that "they had entered the

wrong apartment."  (*Id.* ¶ 11.)  However, Plaintiffs allege that even after Scott stated that they

were in the wrong place, the apartment search continued, as did "the imprisonment" of Plaintiffs

and the "further destruction of" Plaintiffs' property.  (*Id.*)[4]  Plaintiffs also allege that Mount

Vernon and the Police Officer Defendants "negligently or intentionally caused personal injuries

_____

[3] The Court notes that Officer McKennie is not named as a defendant, and that this description of the strip search contradicts Plaintiffs' description of the search later in the FAC. (*See* FAC ¶ 37 (stating that only Jane Doe performed the search).)

[4] Plaintiffs allege that Defendants "continued their search in another apartment in the same building," where they "found and seized drugs and arrested the individual present."  (*Id.* ¶ 12.)

3

and traumatic emotional distress to all Plaintiffs." (*Id.* ¶ 41.) In particular, Plaintiffs allege that they were "rendered sick, sore, lame, and disabled," and have incurred medical expenses as a result of the Police Officer Defendants' actions. (*Id.* ¶ 54.) Finally, Plaintiffs allege that Defendants did not "perform repairs" on Plaintiffs' apartment. (*Id.* ¶ 18.)

Plaintiffs claim that there were defects with the search warrant and the affidavit submitted by Detective Fegan in support of the search warrant (the "Fegan Affidavit" or the "Affidavit").[5] First, Plaintiffs allege that Defendants' search warrant was "defective on its face," because it "described the premises to be searched as '15 South 5th Avenue, 1st floor apartment,'" and therefore "does not state with particularity what is meant by the '1st' floor." (*Id.* ¶ 14.) More specifically, the warrant states that it authorizes a search and seizure "FOR THE FOLLOWING RESIDENTIAL PREMISES: 15 SOUTH 15TH AVENUE, 1ST FLOOR APARTMENT WITH SIDE ENTRANCE ON NORTH SIDE OF HOUSE." (Aff'n of Hina Sherwani ("Sherwani Aff'n") Ex. B (First Floor Search Warrant) ("Search Warrant"), at unnumbered 1 (Dkt. No. 52).) Additionally, Plaintiffs allege that the "warrant describes two . . . individuals[—]FNU LNU[] 'Blue[,]' a male black, and FNU LNU[] 'Jan[,]' a female black," as residing in or being present in the apartment to be searched, but that "[n]either of these individuals resides [in] or was present in [the] apartment." (FAC ¶ 14.) In addition to providing for the search and seizure of those two individuals, the warrant also states that it authorizes a search and seizure of "ANY INDIVIDUALS ON THE PREMISES AT THE TIME OF THE

---

[5] Plaintiffs allege that the Fegan Affidavit "has not been provided to [Plaintiffs'] attorney although demanded by him." (FAC ¶ 14.) However, later in the FAC, Plaintiffs allege that they reviewed the Affidavit and discuss its contents. (*Id.* ¶ 25.) Moreover, the Court ordered Mount Vernon to turn over the Fegan Affidavit to Plaintiffs no later than May 24, 2013, (*see* Dkt. Nos. 37, 42), before Plaintiffs filed the FAC, and Mount Vernon filed the warrant on the docket on March 5, 2012, (*see* Dkt. No. 29), over a year before Plaintiffs filed the FAC.

SEARCH WARRANT EXECUTION INCLUDING BUT NOT LIMITED TO THOSE

EXERCISING CONTROL AND OR DOMINION OVER SAID PREMISES, ACTING IN THE

ROLE OF A LESSEE, SUB-LESSEE AND/OR OWNER." (Search Warrant at unnumbered 1.)

The warrant further provides, "You are therefore commanded at any hour of the day or night,

*without first announcing your purpose or authority*, to make a search of the above listed

Premises and person(s) for cocaine as described in Penal Law Sections 220.00." (*Id.* at

unnumbered 2 (emphasis added).) Furthermore, the warrant lists the items to be seized. (*Id.*)

In addition to alleging that the warrant was defective on its face, Plaintiffs allege that

after the warrant was issued, the Defendant Police Officers and Mount Vernon "as a matter of

policy did no investigation to [e]nsure that, prior to [the] execution of [the] warrant, the facts

[underlying the] warrant were reasonably correct, and that [the] persons named in the warrant

actually resided there." (FAC ¶ 21; *see also id.* ¶ 33 (alleging that the search warrant lacked

probable cause because the Defendant Police Officers and Mount Vernon "did no investigation[,]

as a matter of policy, to [e]nsure that the information they obtained from their informant was

true, reliable, and credible.").)[6] Plaintiffs conclude that all of the above facts are "proof that the

Affidavit submitted to the [c]ourt to obtain [the] search warrant was not credible, and the

'informant' who provided the information was unreliable." (*Id.* ¶ 14.)

With regard to the Fegan Affidavit, Plaintiffs submit that the affiant, Detective Fegan,

who the Court notes is not named as a Defendant in the FAC, stated that "he received

information from a registered and reliable confidential informant," that the Mount Vernon Police

"sent the informant" to 15 South 15th Ave. to "purchase drugs with marked money," that the

---

[6] Furthermore, Plaintiffs allege that the warrant "[sought] illegal drugs, but [did] not
mention any fire arms or weapons." (FAC ¶ 15.)

"police witnessed the transaction, obtained the drugs purchased from the informant, and field tested the drugs," and found that they were cocaine.  (*Id.* ¶ 25.)  Plaintiffs allege that "[they] may presume that [the informant] has some problems [with] the law that cause[d] him to be an informant."  (*Id.*)  Furthermore, Plaintiffs allege that because "[n]o arrest was made" following the controlled drug buy, "it must be concluded that the police surmised that there was not sufficient probable cause to make such an arrest," and therefore there could not have been sufficient "probable cause to grant the search warrant."  (*Id.*)  In addition to what Plaintiffs allege, the Affidavit also states that Detective Fegan received information from a "registered and reliable" CI,[7] that an

> unknown male black in his 40's–50's who wears his hair in long dreadlocks and who identifies himself as "Blue" was selling powder cocaine from his apartment located on the first floor of 15 S 15th Ave, CI further states that "Blue" lives with his wife, an unknown female black in her 30's–40's who identifies herself as "Jan", CI states that "Jan" also sells powder cocaine when "Blue" is not around.  CI states that "Blue" and "Jan" conduct their drug transactions at all times of the day and night, including but not limited to the times between 2100–0600 Hrs.  CI further states that although "Blue" and "Jan" live in the first floor apartment of 15 S 15th Ave they frequently hang out in the 2nd floor apartment of 15 S 15th Ave, and do conduct drug transactions from the 2nd floor apartment.  CI also stated that he/she has purchased powder cocaine from "Blue" and "Jan" 3 times in the past two weeks and has observed "Blue" and "Jan" conduct drug transactions with unknown individuals approx. 7–10 in the past two weeks.

(Sherwani Aff'n Ex. D (Aff. for Search Warrant) ("Fegan Affidavit"), at unnumbered 2.) Furthermore, with respect to the controlled drug buy, Detective Fegan averred that he met with the CI, that the CI made a phone call to "Blue" to place an order for $50 of cocaine, that "Blue" advised the CI he was not home but told him to call "Jan," and that he placed an order with "Jan" for $50 of cocaine.  (*Id.*)  Detective Fegan also averred that he monitored those phone calls.  (*Id.*)

---

[7] The Court granted Defendants' request to redact the CI's identifying information from the Fegan Affidavit before turning it over to Plaintiffs.  (*See* Dkt. No. 42.)

Furthermore, Detective Fegan averred that he searched the CI and found him to be free of

contraband, then gave the CI $50.  (*Id.*)  The CI was then dropped off "at a predetermined

location and while under constant surveillance walked to 15 S 15th Ave," and "at no time did"

the CI "stop or talk to anyone."  (*Id.* at unnumbered 2.)

> CI . . . approached the front door, which leads to the second floor of 15 S 15th Ave.
> A female black later identified as "Jan" answered the door and then stepped out on
> the porch with the CI.  Both "Jan" and the CI then walked down the stairs and into
> the side entrance of 15 S 15th Ave.  CI . . . and "Jan" exited the first floor side
> entrance of 1S S 15th Ave approx. 3 minutes later.  "Jan" then returned upstairs and
> the CI met the undersigned at a predetermined location, at no time while in route to
> that location did CI . . . who was under constant surveillance, stop or talk to anyone.
> At 1945 Hrs. CI . . . turned over to the undersigned one white plastic knotted twist
> containing an amount of cocaine.  A field test was conducted and the results were
> positive for the presence of cocaine, both the white plastic twist containing cocaine
> and the field test kit were placed into evidence.

(*Id.*)  Additionally, the

> CI stated to the undersigned that when she/he knocked on the front door of 15 S
> 15th Ave, 2nd floor apartment, the door was answered by "Jan" who stated she had
> no more cocaine with her on the 2nd floor but instructed CI to follow her to the 1st
> floor.  CI and "Jan" both walked into the 1st floor side entrance of 15 S 15th Ave,
> CI states that "Jan" had him/her wait in the living room as she walked toward the
> back of the apartment, "Jan" returned moments later with the cocaine and gave it
> to the CI in exchange for the Fifty (50) dollars in US Currency.

(*Id.* at unnumbered 3.)  Furthermore, the Fegan Affidavit stated that the CI "has given

information that has led to" arrests under N.Y. Penal Law § 220.16 in three cases—including

five arrests in one case.  (*Id.*)

Plaintiffs also make a number of allegations regarding customs and policies of Mount

Vernon.  Plaintiffs allege that the Police Officer Defendants "were engaged in what was the

custom of the Mt. Vernon Police Department in search warrant cases . . . to arrest and confine

individuals for prolonged periods on 'open' charges."  (FAC ¶ 16.)  Additionally, Plaintiffs

allege that "the[] Police Officers and the City of Mt. Vernon did no investigation[,] as a matter of

policy, to [e]nsure that the information they obtained from their informant was true, reliable, and credible[.]" (*Id.* ¶ 33.) Further, Plaintiffs allege that Defendants were acting "under a color of existing ordinances, regulations, customs and usage of the State of New York," (*id.* ¶ 17), that the "acts by [the Defendant Police Officers] were done by executing a Government Policy and/or custom[] inflicting the injuries and deprivation of constitutional rights to Plaintiffs," (*id.* ¶ 19), and that "[s]aid actions [were] unconstitutional since they [were] a policy statement, ordinance and/or regulation, a decision officially adopted or promulgated by the City of Mt. Vernon as official policy, and [because] the [Defendant Police Officers] represented said policy when inflicting injury on Plaintiffs," (*id.*). Plaintiffs also allege that Mount Vernon is "responsible for the supervision[,] . . . management, control[,] and conduct of its police officers." (*Id.* ¶ 24; *see also id.* ¶ 30 ("That said facts as previously stated, exhibit a custom of the Mt. Vernon Police Department in search warrant cases. These acts by the named Mt. Vernon Police Officers acting in their official capacities, performing their duties were committed under the color of existing ordinances, regulations, custom and usage of [t]he State of New York[] and the City of Mt. Vernon[,] subjecting Plaintiffs to the deprivation of the rights, privileges, and immunities secured to them by the U.S. Constitution."); *id.* ¶ 47 ("These named Police Officers executed a government policy or custom, of the City of Mt. Vernon, whether made by its law makers or by these Police officers whose acts or edicts represent official policy, and inflicted the injury to Plaintiffs that the City of Mt. Vernon is responsible for under 42 U.S.C. §1983."); *id.* ¶ 53 ("There exists a direct causal link between the City of Mt. Vernon, its policies and customs, with the deprivation of Plaintiff's constitutional rights under §1983. The municipal policy as previously stated was the force behind these constitutional violations. The facts previously stated as to the custom and policy of the City of Mt. Vernon in search warrant cases, demand an

8

inference of said wrongful conduct by the City of Mt. Vernon.").)  Furthermore, Plaintiffs allege that the City of Mount Vernon is liable for inadequate supervision under New York law and § 1983 from the facts alleged above, as well as the fact that Scott "was supervising the other officers, directing the handcuffing and arrest[] of [Green], directing a vaginal search of [Green] by . . . Jane Doe with . . . Fox and . . . Kushner threatening [Plaintiffs] with harm by pointing guns at them."  (*Id.* ¶ 37; *see also id.* ¶ 39 ("The City of Mt. Vernon is liable under §1983 and under New York [l]aw for failing to properly supervise [the Police Officer Defendants] who were acting in their official capacities under the custom and usage of the City of Mt. Vernon.").)

Finally, Plaintiffs allege that the Police Officer Defendants are not immune from suit because it was "apparent to each individual officer [that their actions] were inconsistent with acceptable police practice."  (*Id.* ¶ 42; *see also id.* ¶ 43 (same).)

B.  Procedural Background

Plaintiffs originally filed suit in New York State Court, and Defendants removed to Federal Court based on the existence of a federal question on January 29, 2010.  (*See* Dkt. No. 1.)  Plaintiffs filed an Amended Complaint on December 23, 2010, (*see* Dkt. No. 11), which was dismissed without prejudice on September 23, 2011 by an Order that addressed various deficiencies with Plaintiffs' pleadings, (*see* Dkt. No. 21).  Plaintiffs then filed a Second Amended Complaint, (*see* Dkt. No. 23), which Defendants again moved to dismiss, (*see* Dkt. No. 27).  Following oral argument, the Motion To Dismiss was denied without prejudice to allow Plaintiffs to further amend their Complaint consistent with the instructions provided by the Court at argument.  (*See* Dkt. No. 33.)  Plaintiffs filed a Third Amended Complaint in December 2012. (*See* Dkt. No. 34.)  Finally, Plaintiffs filed the Fourth Amended Complaint on June 6, 2013.  (*See* Dkt. No. 47.)  Pursuant to a scheduling order entered by the Court, (*see* Dkt. No. 50), Defendants

filed their Motion To Dismiss and accompanying papers on September 20, 2013, (*see* Dkt. Nos. 51–53), Plaintiffs filed their Opposition on October 4, 2013, (*see* Dkt. Nos. 54–56), and Defendants filed their Reply on October 25, 2013, (*see* Dkt. No. 57).

## II.  Discussion

### A.  Rules 8 and 10

Defendants first move to dismiss Plaintiffs' claims on the ground that the FAC violates Federal Rules of Civil Procedure 8 and 10.  As relevant here, Rule 8 provides that "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and that "[e]ach allegation must be simple, concise, and direct," *id.* at 8(d)(1).  Rule 10 provides that "[a] party must state its claims . . . in numbered paragraphs, each limited as far as practicable to a single set of circumstances." Fed. R. Civ. P. 10(b).  Nonetheless, Rule 8 also provides that "[n]o technical form is required" to comply with the rules, Fed. R. Civ. P. 8(d)(1), and that "[p]leadings must be construed so as to do justice," *id.* at 8(e).

From these rules emerge two legal standards relevant to Defendants' Motion.  First, the latter part of Rule 8(a)(2) contains what the Supreme Court in *Twombly* called the "Rule 8 entitlement requirement," which is that "the 'plain statement' possess enough heft to 'sho[w] that the pleader is entitled to relief.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).  Second, the first part of Rule 8(a)(2) contains what may be termed the "short-and-plain-statement requirement," which has been independently interpreted, perhaps along with the requirement in Rule 8(d)(1) that allegations be "simple, concise, and direct," to protect interests separate from the entitlement requirement.  *See Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) (discussing the interests underlying the

short-and-plain-statement requirement); *cf. Wynder v. McMahon*, 360 F.3d 73, 80 (2d Cir. 2004)

(noting the "critical distinction between the notice requirements of Rule 8(a) and the

requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be

granted").  The first requirement asks, "how short is too short?"  The second requirement asks,

"how long is not short enough?"

    In support of their Motion To Dismiss, Defendants quote *Salahuddin v. Cuomo*, wherein

the Second Circuit identified the reasoning underlying the short-and-plain-statement

requirement:

> The statement should be plain because the principal function of pleadings under the
> Federal Rules is to give the adverse party fair notice of the claim asserted so as to
> enable him to answer and prepare for trial.  The statement should be short because
> unnecessary prolixity in a pleading places an unjustified burden on the court and
> the party who must respond to it because they are forced to select the relevant
> material from a mass of verbiage.

861 F.2d at 42 (alteration, citations, and internal quotation marks omitted).  (*See* Mem. of Law in

Supp. of Defs.' Mot. To Dismiss ("Defs.' Mem.") 4–5 (Dkt. No. 53).)  Defendants argue that the

FAC violates Rules 8 and 10 because "Defendants are unable to decipher what cause[s] of

action" Plaintiffs are attempting to plead.  (*See id.* at 7; *see also id.* at 13 (arguing that it is

"entirely unclear what causes of action are being alleged").)

    "The fundamental command of the Federal Rules of Civil Procedure is never to exalt

form over substance."  *Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338, 343 (2d Cir.

2006) (internal quotation marks omitted).  When enforcing technical requirements on litigants,

courts are always mindful of the "jurisprudential preference for adjudication of cases on their

merits rather than on the basis of formalities."  *Salahuddin*, 861 F.2d at 42; *see also Swierkiewicz

v. Sorema N.A.*, 534 U.S. 506, 514 (2002) ("The liberal notice pleading of Rule 8(a) is the

starting point of a simplified pleadings system, which was adopted to focus litigation on the

merits of a claim."); *cf. Wynder*, 360 F.3d at 80 (noting that "form matters in our system of adjudication," but holding that the complaint "[was] not so lacking in form as to warrant dismissal" (internal quotation marks omitted)).

Instead of focusing on whether a complaint's allegations are "short and plain" or "simple, concise, and direct," the Court asks whether the complaint gives "fair notice" to the defendants. *See Simmons v. Abruzzo*, 49 F.3d 83, 86 (2d Cir. 1995) ("The function of pleadings under the Federal Rules is to give fair notice of the claims asserted." (internal quotation marks omitted)); *see also Amron*, 464 F.3d at 343 ("A complaint need only 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" (quoting *Swierkiewicz*, 534 U.S. at 513)); *Wynder*, 360 F.3d at 79 ("The key to Rule 8(a)'s requirements is whether adequate notice is given.").  "Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial."  *Simmons*, 49 F.3d at 86 (internal quotation marks omitted). Thus, courts will not dismiss a complaint that is arguably prolix or unintelligible unless the complaint's form or substance prevents the defendant from forming a "fair understanding" of the plaintiff's allegations or otherwise prejudices the defendant in responding to the complaint.  *See Amron*, 464 F.3d at 343 ("Dismissal is improper on technical pleading irregularities, which are excusable as long as they neither undermine the purpose of notice pleading nor prejudice the adverse party." (internal quotation marks omitted)); *see also Phillips v. Girdich*, 408 F.3d 124, 130 (2d Cir. 2005) ("Although [the plaintiff's] allegations were not neatly parsed and included a great deal of irrelevant detail, that is not unusual from a pro se litigant.  As long as his mistakes do not prejudice his opponent, a plaintiff is entitled to trial on even a tenuous legal theory, supported by the thinnest of evidence." (citation and italics omitted)); *Kittay v. Kornstein*, 230

F.3d 531, 542 (2d Cir. 2000) (finding that a complaint satisfied Rule 8 where the "allegations

[were] sufficiently clear to have provided [the defendant] with a fair understanding of what the

plaintiff [was] complaining about and to have allowed [the defendant] to know whether there is a

legal basis for recovery" (internal quotation marks omitted)).

Here, although Plaintiffs' pleadings are sometimes hard to parse, the Court concludes that

they give Defendants fair notice of the claims that Plaintiffs are trying to assert.  Indeed, this is

evident from the fact that Defendants also bring a Motion To Dismiss under Rule 12(b)(6) where

they identify and respond to claims raised by Plaintiffs.  In particular, the Court finds that

Plaintiffs raise the following claims: a § 1983 claim for municipal liability against Mount

Vernon, a Fourth Amendment claim for unreasonable search and seizure, an excessive force

claim, an assault and battery claim, a trespass claim, a false imprisonment/false arrest claim, an

intentional and/or negligent infliction of emotional distress claim, and a state law inadequate

supervision claim.  Therefore, Defendants' Motion To Dismiss based on Rules 8 and 10 is

denied.

### B.  Rule 12(b)(6)

#### 1.  Standard of Review

Next, Defendants move to dismiss Plaintiffs' FAC under Rule 12(b)(6) of the Federal

Rules of Civil Procedure.  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss

does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his

entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do." *Twombly,* 550 U.S. at 555 (citations, alterations, and

internal quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure,

which, as noted, requires that a prayer for relief contain "a short and plain statement of the claim

showing that the pleader is entitled to relief[,]" Fed. R. Civ. P. 8(a)(2), "demands more than an

unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009).[8]  "Nor does a complaint suffice if it tenders naked assertions devoid of further

factual enhancement." *Id.* (alterations and internal quotation marks omitted).  Instead, a

complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative

level . . . ." *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated adequately, it

may be supported by showing any set of facts consistent with the allegations in the complaint,"

*id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible

on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[] across the line from

conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679

("Determining whether a complaint states a plausible claim for relief will . . . be a

context-specific task that requires the reviewing court to draw on its judicial experience and

common sense.  But where the well-pleaded facts do not permit the court to infer more than the

mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the

pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R.

Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hyper-

technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a

plaintiff armed with nothing more than conclusions.").

---

[8] Plaintiffs' counsel's reliance on pre-*Iqbal* pleading standards is obviously misplaced. (*See* Letter from Andrew C. Risoli to Court (July 7, 2013) 1 (Dkt. No. 48) ("I do not think the case cited by them, *Iqbal*, applies in any way to our case."); Mem. of Law in Supp. of Pls.' Opp'n to Defs.' Mot. To Dismiss ("Pls.' Mem.") 25 (Dkt. No. 55) ("Dismissal of a complaint for failure to state a claim is only proper where it appears, beyond any doubt[,] that the Plaintiff can prove no set of facts in support of him [sic] claim to entitle him to relief." (citing *Harris v. City of New York*, 186 F.3d 243 (2d Cir. 1999))).)

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007); *see also Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P.*, 737 F.3d 166, 176 (2d Cir. 2013) ("In reviewing a dismissal pursuant to Rule 12(b)(6), we . . . accept all factual allegations in the complaint as true . . . ." (alterations and internal quotation marks omitted)); *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013) ("In addressing the sufficiency of a complaint we accept as true all factual allegations and draw from them all reasonable inferences."). Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court . . . draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T&M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Therefore, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679.

## 2. Materials Considered in Deciding this Motion

"In ruling on a 12(b)(6) motion, . . . a court may consider the complaint[,] . . . any written instrument attached to the complaint as an exhibit[,] or any statements or documents incorporated in it by reference," as well as "matters of which judicial notice may be taken, and documents either in [the] plaintiff['s] possession or of which [the] plaintiff[] had knowledge and relied on in bringing suit." *Kalyanaram v. Am. Ass'n of Univ. Professors at the N.Y. Inst. of Tech., Inc.*, 742 F.3d 42, 44 n.1 (2d Cir. 2014) (brackets and internal quotation marks omitted). "To be incorporated by reference, the complaint must make a clear, definite[,] and substantial reference to the documents[,] and to be integral to a complaint, the plaintiff must have (1) actual

notice of the extraneous information and (2) relied upon the documents in framing the complaint." *Bill Diodato Photography LLC v. Avon Products, Inc.*, No. 12-CV-847, 2012 WL 4335164, at *3 (S.D.N.Y. Sept. 21, 2012) (brackets and internal quotation marks omitted)). When considering whether a plaintiff relies on the document in framing the complaint, it is sufficient if "the complaint relies heavily, albeit implicitly, upon [the document's] terms and effect." *Capela v. J.G. Wentworth, LLC*, No. 09-CV-882, 2009 WL 3128003, at *1 n.2 (E.D.N.Y. Sept. 24, 2009); *see also Baraliu v. Vinya Capital, L.P.*, No. 07-CV-4626, 2009 WL 959578, at *4 (S.D.N.Y. Mar. 31, 2009) (noting that a court may review "any documents that are integral to [the] plaintiff's allegations even if not explicitly incorporated by reference").

Both Plaintiffs and Defendants have submitted documents in connection with their motion papers that are not attached to the FAC, some of which are relevant to the instant Motion, and some of which are not.  The documents submitted by Plaintiffs that are at all relevant to deciding this Motion To Dismiss are (1) Green's Affidavit, (Aff. in Opp'n to Defs.' Mot. To Dismiss ("Green Aff.") (Dkt. No. 54)); (2) Defendants' Rule 26(a) disclosure, including the police report regarding the search of Plaintiffs' home and the search warrant, (Pls.' Aff'n in Opp'n to Mot. ("Risoli Aff'n") Ex. B (Dkt. No 56)); and (3) the Fegan Affidavit, (*id.* at Ex. E).[9] Defendants submitted the following documents: (1) the search warrant for 15 South 15th Avenue, 1st floor, (Sherwani Aff'n Ex. B); (2) the search warrant for 15 South 15th Avenue, 2nd floor, (*id.* at Ex. C); and (3) the Fegan Affidavit, (*id.* at Ex. D).

---

[9] The other documents submitted by Plaintiffs simply have no bearing on this Motion. The Court notes that Plaintiffs submitted photographs purporting to show the condition of Plaintiffs' apartment after the search.  (*See* Risoli Aff'n ¶ 2.a (stating that annexed as Exhibit A are "[c]opies of photos depicting the condition of [Plaintiffs'] apartment at the conclusion of [the] search.").)  However, the copies submitted to the Court are completely unascertainable.  In any event, it would not be proper for the Court to consider them because they are not incorporated by reference into or integral to the FAC.

First, the Court may not consider factual allegations contained in Green's Affidavit, as it is not attached to the FAC, despite the fact that the Court raised this issue with Plaintiffs more than two years ago, (*see* Risoli Aff'n Ex. D (Dec. 6, 2012 Conference Tr.), at 10 (The Court: "Ms. Green's affidavit is neither here nor there because it's outside the four corners of the complaint")), because it is neither incorporated by reference into the FAC nor integral to the FAC.

Second, the Court may consider the warrant for Plaintiffs' apartment and the Fegan Affidavit, as they are integral to the FAC.  Plaintiffs had actual notice of both documents before drafting the FAC.  Although, at one point in the FAC, Plaintiffs allege that the affidavit "has not been provided to Plaintiffs," (FAC ¶ 21), later in the FAC Plaintiffs allege that they reviewed the Fegan Affidavit, and they quote from it in detail, (*id.* ¶ 25).  Additionally, it is evident that Plaintiffs had actual notice of the warrant because they summarize and quote from it.  (*Id.* ¶¶ 14–15.)  In addition to it being apparent from the face of the FAC that Plaintiffs had notice of the warrant and the Fegan Affidavit, it is also clear from the record that Mount Vernon produced the warrant and affidavit to Plaintiffs, as the Court ordered Mount Vernon to turn over the Fegan Affidavit to Plaintiffs no later than May 24, 2013, (*see* Dkt. Nos. 37, 42), which was before the FAC was filed, and Mount Vernon filed the warrant on the docket on March 5, 2012, (*see* Dkt. No. 29).

Additionally, Plaintiffs relied upon the Fegan Affidavit and search warrant in framing the FAC.  In particular, Plaintiffs' claims for unreasonable search and seizure in violation of the Fourth Amendment, trespass, and false imprisonment/false arrest are explicitly based on their assertions that the warrant was invalid due to a lack of particularity and a lack of probable cause. For these reasons, and because Plaintiffs do not dispute the authenticity of these documents, the

Court will consider the search warrant for Plaintiffs' apartment and the Fegan Affidavit.  *See Brodeur v. City of New York*, No. 99-CV-651, 2002 WL 424688, at *2 (S.D.N.Y. Mar. 18, 2002) (holding that it is appropriate to consider a search warrant application without converting a motion to dismiss to one for summary judgment); *see also Cayo v. Sefcik*, No. 14-CV-38, 2014 WL 3419578, at *5 n.10 (D. Conn. July 11, 2014) ("The [c]ourt can consider the contents of the [a]rrest [w]arrant [a]pplication and its attachments because they are discussed extensively in the complaint."); *Vessa v. City of White Plains*, No. 12-CV-6989, 2014 WL 1271230, at *4 n.9 (S.D.N.Y. Mar. 27, 2014) ("The [c]ourt may consider the [s]earch [w]arrant [o]rder, as it is clearly incorporated in the [a]mended [c]omplaint by reference.  Indeed, the crux of [the] [p]laintiff's case is that [the] [d]efendants wrongfully obtained the warrant at issue using fabricated and unsubstantiated information." (citations omitted)), *aff'd*, 588 F. App'x 9 (2d Cir. 2014); *McPhearson v. Anderson*, 874 F. Supp. 2d 573, 579 n.7 (E.D. Va. 2012) (considering a warrant included in the defendant's moving papers in deciding a motion to dismiss because the plaintiff did "not challenge[] the warrant's authenticity, and he clearly relie[d] on it throughout his [c]omplaint" as it formed the basis of his allegations against one of the defendants); *Badillo v. Stopko*, No. 11-CV-4815, 2012 WL 1565303, at *5 (D.N.J. May 2, 2012) ("Here, while the [a]ffidavit of [a]pplication for the arrest was not attached to the [c]omplaint, portions of it are quoted at length in it and [the] [p]laintiffs' claims rely on it.  Therefore, the [c]ourt finds it appropriate to consider the [affidavit.]").  However, the Court will not consider the search warrant for 15 South 15th Ave., 2nd floor, which was submitted by Defendants, because that document is not referenced in Plaintiffs' FAC, nor is there any evidence that Plaintiffs had notice of the document or that they relied on that document in drafting the FAC.

Third, the Court will not consider Defendants' Rule 26(a) disclosure, including the attached police report.  This document is not even mentioned in the FAC, and therefore is not incorporated by reference.  Furthermore, there is no indication that Plaintiffs had notice of this document or that they relied on its terms and effects when drafting the FAC.

Finally, the Court will not consider the new factual assertions Plaintiffs make in their opposition papers.  *See Fonte v. Bd. of Managers of Cont'l Towers Condo.,* 848 F.2d 24, 25 (2d Cir. 1988) ("Factual allegations contained in legal briefs or memoranda are also treated as matters outside the pleading[s] for purposes of Rule 12(b)."); *Tolliver v. Skinner*, No. 12-CV-971, 2013 WL 658079, *11 (S.D.N.Y. Feb. 11, 2013) (same); *McCray v. City of New York*, No. 03-CV-9685, 2007 WL 4352748, at *30 n.34 (S.D.N.Y. Dec. 11, 2007) (same); *GCG Int'l, Inc. v. Eberhardt*, No. 05-CV-2422, 2005 WL 2647942, at *4 (S.D.N.Y. Oct. 17, 2005) (same); *Arnold v. Goetz*, 245 F. Supp. 2d 527, 539 (S.D.N.Y. 2003) (same).

### 3.  Qualified Immunity

Under certain circumstances, police officers are immune under federal or New York law for their actions.  For claims brought under federal law, "[a] police officer is entitled to qualified immunity from liability for his discretionary actions if either (1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act."  *Cerrone v. Brown*, 246 F.3d 194, 199 (2d Cir. 2001) (citation and internal quotation marks omitted).  Because qualified immunity "reflects an *immunity from suit* rather than a mere defense to liability . . . it is appropriate to decide the issue of qualified immunity, when raised, at an early stage of the litigation, such as when deciding a pre-answer motion to dismiss."  *Betts v. Shearman*, No. 12-CV-3195, 2013 WL 311124, at *4 (S.D.N.Y. Jan.

24, 2013) (internal quotation marks omitted), *aff'd*, 751 F.3d 78 (2d Cir. 2014).  "[W]hen determining a motion to dismiss on qualified immunity grounds in advance of full merits discovery, the plaintiff's version of the facts is presumed to be true, and the question to be answered is whether the defendant officer, confronted with the facts as alleged by [the] plaintiff, could reasonably have believed that his actions did not violate some settled constitutional right." *5 Borough Pawn, LLC v. City of New York*, 640 F. Supp. 2d 268, 285 (S.D.N.Y. 2009).

Similarly, for claims brought under New York law, government officials are granted "qualified immunity . . . except where the officials' actions are undertaken in bad faith or without reasonable basis."  *Jones v. Parmley*, 465 F.3d 46, 63 (2d Cir. 2006); *see also 5 Borough Pawn*, 640 F. Supp. 2d at 286 (same).  "'To be entitled to qualified immunity, it must be established that it was objectively reasonable for the police officers involved to believe that their conduct was appropriate under the circumstances, or that officers of reasonable competence could disagree as to whether their conduct was proper.'"  *5 Borough Pawn*, 640 F. Supp. 2d at 286 (quoting *Allen v. City of New York*, 03-CV-2829, 2007 WL 24796, at *24 (S.D.N.Y. Jan. 3, 2007)).  "Thus, as is true of federal law, an officer's entitlement to qualified immunity under New York law depends on the reasonableness of his actions.  However, the reasonableness of an officer's action is judged with references to state law and the state, not the federal, constitution."  *Id.*

### 4.  Analysis

As noted above, the Court discerns the following claims in Plaintiffs' FAC: an excessive force claim, an assault and battery claim, a trespass claim, a false imprisonment/false arrest claim, a negligent and/or intentional infliction of emotional distress claim, an inadequate supervision claim, a Fourth Amendment claim for unreasonable search and seizure, and a § 1983 claim for municipal liability against Mount Vernon.

a.  Unreasonable Search Claim

First, Plaintiffs bring a § 1983 claim for unreasonable search against the Police Officer

Defendants.  Plaintiffs' pleadings raise four issues: whether the search of the apartment was

reasonable, whether the no-knock entry was reasonable, whether the strip searches of Green were

reasonable, and whether the destruction of Plaintiffs' property during the search was reasonable.

With respect to the first issue of whether the search of the apartment was reasonable, the

pleadings raise three issues: whether the warrant was invalid on its face, whether the warrant was

unsupported by an adequate finding of probable cause to search the premises, and whether the

search, even if it otherwise had been lawful, was rendered unlawful by the alleged statement by

Scott that the Officers knew they were searching the wrong location.

To be valid under the Fourth Amendment, a search warrant must (1) be based on

probable cause, (2) be supported by oath or affirmation, (3) describe with particularity the place

to be searched, and (4) describe with particularity the things to be seized.  *Groh v. Ramirez*, 540

U.S. 551, 557 (2004).  Here, Plaintiffs dispute that the warrant meets the first and third

requirements.  However, a "search is presumptively reasonable when executed pursuant to a

warrant."  *Vaher v. Town of Orangetown*, 916 F. Supp. 2d 404, 426 (S.D.N.Y. 2013).  Thus, a

"police officer who relies in good faith on a warrant issued by a neutral and detached magistrate

upon a finding of probable cause is presumptively shielded by qualified immunity."  *Simms v.*

*Village of Albion*, 115 F.3d 1098, 1106 (2d Cir. 1997).

With respect to the Fourth Amendment's mandate that a warrant must "describe the place

to be searched," *United States v. Galpin*, 720 F.3d 436, 446 (2d Cir. 2013), "[i]t is

long-established that '[i]t is enough if the description is such that the officer with a search

warrant can, with reasonable effort ascertain and identify the place intended,'" *United States v.*

*Voustianiouk*, 685 F.3d 206, 211 (2d Cir. 2012) (second alteration in original) (quoting *Steele v. United States*, 267 U.S. 498, 503 (1925)).  "Particularity concerns arise when a warrant's description of the place to be searched or the items to be seized 'is so vague that is fails reasonably to alert executing officers to the limits' of their search and seizure authority." *United States v. Levy*, No. 11-CR-62, 2013 WL 664712, at *5 (S.D.N.Y. Feb. 25, 2013) (quoting *United States v. Clark*, 638 F.3d 89, 94 (2d Cir. 2011)).  Additionally, with respect to qualified immunity, in some circumstances "'a warrant may be so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officer cannot reasonably presume it to be valid.'"  *United States v. George*, 975 F.2d 72, 77 (2d Cir. 1992) (italics omitted) (quoting *United States v. Leon*, 468 U.S. 897, 923 (1984)) (discussing qualified immunity in the context of the exclusionary rule).

Plaintiffs argue that the warrant was invalid because it merely identifies the premises to be searched as "'15 South 5th Avenue, 1st floor apartment,'" and therefore "does not state with particularity what is meant by the '1st' floor."  (FAC ¶ 14.)  However, in addition to identifying the location to be searched as the 1st floor apartment, the warrant also specifies that it is the "1ST FLOOR APARTMENT WITH SIDE ENTRANCE ON NORTH SIDE OF HOUSE." (Search Warrant at unnumbered 1.)  Where, as in this case, the police "knew . . . that the building was a multi-occupancy structure, the warrant must specify which unit is to be searched." *United States v. Wiggins*, 298 F.R.D. 75, 79 (E.D.N.Y. 2014).  The warrant here does so.  Plaintiffs do not plead any facts that could plausibly lead to the conclusion that an officer with the warrant could not "with reasonable effort ascertain and identify the place intended," *Voustianiouk*, 685 F.3d at 211 (internal quotation marks omitted), for example that there were multiple units with a side entrance on the north side of the house, or that there was any reason why the phrase "first

floor" would be ambiguous, for example, if the house were built on a hill.  Furthermore, this warrant is certainly not so "facially deficient" in failing to particularize the place to be searched "that the executing officer cannot reasonably presume it to be valid."  *George*, 975 F.2d at 77 (internal quotation marks omitted).  Thus, the claim for unreasonable search based on the face of the warrant is dismissed.

Next, "[p]robable cause for a search exists 'where the known facts and circumstances are sufficient to warrant a [person] of reasonable prudence in the belief that contraband or evidence of a crime will be found.'"  *United States v. Feng Ling Liu*, No. 12-CR-934, 2014 WL 101672, at *3 (S.D.N.Y. Jan. 10, 2014) (alteration in original) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).  "In determining what constitutes probable cause to support a search warrant when the warrant is based upon information obtained through the use of a confidential informant, courts assess the information by examining the 'totality of the circumstances' bearing upon its reliability."  *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (citing *Illinois v. Gates*, 462 U.S. 213, 230–31 (1983)).  "[T]he issuance of a warrant by a neutral magistrate, which depends on a finding of probable cause, creates a presumption that it was objectively reasonable for the officers to believe that there was probable cause . . . ."  *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991).  "To rebut that presumption, a plaintiff must make a substantial preliminary showing that the affiant knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit and that the allegedly false statement was necessary to the finding of probable cause."  *Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 466 (S.D.N.Y. 2008) (internal quotation marks omitted); *see also Rivera v. United States,* 928 F.2d 592, 602 (2d Cir. 1991) ("A plaintiff who argues that a warrant was issued on less than probable cause faces a heavy burden."); *Merriweather v. City of New York*, 12-CV-

5258, 2015 WL 57399, at *7 (S.D.N.Y. Jan. 5, 2015) ("Where a magistrate has determined that
an affidavit presented to him provides probable cause for the issuance of a warrant, the person
challenging the warrant must make a substantial preliminary showing that the affiant knowingly
and intentionally, or with reckless disregard to the truth, made a false statement in his affidavit
and that the allegedly false statement was necessary to the finding of probable cause." (brackets
and internal quotation marks omitted)).

   Here, Plaintiffs do not allege that Detective Fegan made any false statements or misled
the city judge who issued the warrant.  Rather, they merely argue that what was presented to the
judge was insufficient to constitute probable cause.  According to Plaintiffs, Fegan only averred
in his Affidavit that he "received information from a registered and reliable confidential
informant," that the Mount Vernon Police "sent the informant to 15 S. 15th Ave to purchase
drugs with marked money," that the "police witnessed the transaction, obtained the drugs
purchased [by] the informant, and field tested the drugs [and found] [them] to be cocaine."
(FAC ¶ 25.)  However, the Fegan Affidavit also gave a detailed description of the controlled buy,
averred that the CI stated that "Blue" and "Jan" live in the first floor apartment, but also
"frequently hang out" in the second floor apartment, that during the controlled buy, the CI
approached the front door, which leads to the second floor, that "Jan" opened the door, and that
"Jan" and the CI walked to the side entrance of the house.  (Fegan Affidavit at unnumbered 2–3.)
Furthermore, the

> CI stated to the undersigned that when she/he knocked on the front door of 15 S
> 15th Ave, 2nd floor apartment, the door was answered by "Jan" who stated she had
> no more cocaine with her on the 2nd floor but instructed CI to follow her to the 1st
> floor.  CI and "Jan" both walked into the 1st floor side entrance of 15 S 15th Ave,
> CI states that "Jan" had him/her wait in the living room as she walked toward the
> back of the apartment, "Jan" returned moments later with the cocaine and gave it
> to the CI in exchange for the Fifty (50) dollars in US Currency.

24

(*Id.* at unnumbered 3.)  Finally, the Fegan Affidavit stated that the CI "has given information that has led to" arrests under N.Y. Penal Law § 220.16 in three cases—including five arrests in one case.  (*Id.*)

Plaintiffs allege that there was no probable cause to search for several reasons.  First, the warrant identified two people residing in or being present in the apartment, but neither person in fact resided in or was present in the apartment.  (FAC ¶ 14.)  Second, because the police did not make an arrest following the controlled drug buy, there must not have been probable cause for an arrest, and therefore there cannot be probable cause for a search.  (*Id.* ¶ 25.)  Third, the informant who provided the information was not credible.  (*Id.* ¶ 14.)  Finally, police officers did not investigate to ensure that the information provided by the informant was accurate.  (*Id.* ¶ 20.)

First, that the two people identified in the warrant allegedly turned out not to be present at the time the search was executed does not undermine a finding of probable cause, as the "Supreme Court has held that the validity of a warrant is not impaired if it is based on seemingly reliable information which is later found to be erroneous."  *Lewis v. City of Mount Vernon*, 984 F. Supp. 748, 756 (S.D.N.Y. 1997) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 184 (1990)).  Second, the lack of an arrest following the controlled drug buy simply does not warrant a conclusion that there was not probable cause to arrest or search.  That Defendants may have wanted to further investigate the case, instead of arresting the two suspects, hardly suggests the absence of probable cause to arrest or to search the premises believed to contain additional evidence of criminal conduct.  Finally, with respect to the allegations that the informant was not credible and police officers did not investigate to ensure that the information provided by the informant was accurate, Plaintiffs do not meet their burden of alleging facts that the affiant knowingly, intentionally, or recklessly, made a false statement that was necessary to the finding

of probable cause.  Plaintiffs' assertion that the informant was not credible is conclusory, and there is no plausible claim that the informant was unreliable or, more importantly, that the affiant and/or the officers who executed the warrant had reason to doubt the informant's credibility. Furthermore, police officers are entitled to rely in good faith on information from informants. For example, in *Bancroft v. City of Mount Vernon*, 672 F. Supp. 2d 391 (S.D.N.Y. 2009), the plaintiffs "challenge[d] the search warrant on the ground that the information allegedly giving rise to probable cause was obtained from a single confidential informant, who claimed to have been to the premises a grand total of three times." *Id.* at 401.  The court in that case held that that was "of no moment," reasoning that the police officers determined that the CI was credible, as "his information had led to the recovery of contraband in the past," and that was "sufficient to allow the magistrate to conclude that the informant is generally credible." *Id.*  Furthermore, the court held that "[r]eliance on information from a single confidential informant whom the police and the magistrate deem credible is enough to support a finding of probable cause." *Id.*  Here, as in *Bancroft*, there is "no allegation, let alone evidence" that Detective Fegan knew that the CI was lying or acted with reckless disregard to whether the CI was lying. *Id.*  Furthermore, even if the Fegan Affidavit merely relied on information from the CI, "there is no constitutional requirement that" "the police . . . conduct any independent investigation," and "the warrant is not infirm if the police choose to rely on an informant in lieu of an investigation." *Id.*; *see also McKim v. County of Rensselaer*, No. 09-CV-650, 2011 WL 2580327, at *10 (N.D.N.Y. June 28, 2011) ("[T]o the extent that plaintiffs are seeking to invalidate the warrant on the basis of defendants' decision not to engage in further investigation [and to instead rely on a CI], that attempt is unavailing."); *Lynch*, 567 F. Supp. 2d at 466 ("[The] [p]laintiffs have cited no authority for the proposition that [the] defendants were constitutionally required to seek

additional corroboration, or that reliance on information provided by a single confidential informant whom the police and issuing magistrate deem credible is not enough to create probable cause."). Moreover, here, Detective Fegan *did* do an investigation—he oversaw a controlled buy at Plaintiffs' apartment. In sum, the Fegan Affidavit supports a finding of probable cause. In any event, Plaintiffs allege no facts indicating that Detective Fegan knowingly and intentionally or recklessly made a false statement in his affidavit that was necessary to the finding of probable cause, and therefore the Police Officer Defendants are entitled to qualified immunity on this claim, even if there was not probable cause. *See Rivera,* 928 F.2d at 602; *Merriweather,* 2015 WL 57399, at *7 ("Where a magistrate has determined that an affidavit presented to him provides probable cause for the issuance of a warrant, the person challenging the warrant must make a substantial preliminary showing that the affiant knowingly and intentionally, or with reckless disregard to the truth, made a false statement in his affidavit and that the allegedly false statement was necessary to the finding of probable cause." (brackets and internal quotation marks omitted)); *Lynch,* 567 F. Supp. 2d at 466 (same).

The Court finds that the Defendant Police Officers were immune from suit when acting pursuant to the search warrant; however, that does not end the inquiry. Plaintiffs allege that at some point during the search, Scott admitted that the Officers were in the wrong location, but that the search continued. (FAC ¶ 11.) Taking that allegation as true, at the point that Scott allegedly knew they were in the wrong apartment, the search was no longer constitutional, and the Officers' actions were no longer shielded by immunity. The Court holds that "the officers were obligated to retreat as soon as they knew or reasonably should have known that there was a mistake, i.e., they were in the wrong residence." *Pray v. City of Sandusky,* 49 F.3d 1154, 1159 (6th Cir. 1995); *see also Maryland v. Garrison,* 480 U.S. 79, 87 (1987) ("[The police officers]

27

were required to discontinue the search of [the] respondent's apartment as soon as they discovered that there were two separate units on the third floor and therefore were put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant."); *Simmons v. City of Paris*, 378 F.3d 476, 479–80 (5th Cir. 2004) (noting that there is a "clearly established constitutional rule that, when law enforcement officers are executing a search warrant and discover that they have entered the wrong residence, they should immediately terminate their search"); *Closure v. Onondaga County*, No. 06-CV-926, 2007 WL 446595, at *7 (N.D.N.Y. Feb. 7, 2007) ("[I]t is clear that the qualified immunity defense cannot be sustained as a matter of law in the presence of evidence that police officers continued to search a residence after realizing they were in the wrong home . . . ."); *cf. Lewis*, 984 F. Supp. at 756 (holding that the "officers' belief that the continuance of the search would not violate the Fourth Amendment rights of the occupants of the premises was not objectively unreasonable" where "there [was] no evidence that the officers unreasonably continued to search after they knew they were in the wrong apartment," and instead they "vacated the premises shortly after the conclusion of the search and they did not unreasonably prolong the search after they determined that they had entered the wrong apartment"). For the above reasons, the Court holds that Plaintiffs plausibly plead a claim for unreasonable search and seizure for the search that occurred after the Police Officer Defendants allegedly realized that they were searching the wrong location.

Second, Plaintiffs allege that the search, even incident to the warrant, was unreasonable because their property was destroyed during the course of the search. In particular, Plaintiffs allege that the Officers "completely ransacked" the apartment, "destroying much of [their] property," and that the Officers left "without performing any repairs." (FAC ¶ 10; *see also id.* ¶ 15 (alleging that the Defendant Police Officers "ransack[ed] [Plaintiffs'] apartment with guns

28

drawn").)  "Excessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment . . . ."  *United States v. Ramirez*, 523 U.S. 65, 71 (1998). "However, it is well recognized that officers executing search warrants on occasion must damage property in order to perform their duty," and "before any due process liability can be imposed for property damage occurring in a lawful search, it must be established that the police acted unreasonably or maliciously in bringing about the damage."  *Smith v. City of New York*, No. 04-CV-3286, 2010 WL 3397683, at *13 (S.D.N.Y. Aug. 27, 2010) (brackets and internal quotation marks omitted), *aff'd sub nom. Smith v. Tobon*, 529 F. App'x 36 (2d Cir. 2013).  Moreover, there must be allegations that "more than ordinary disarray and damage incident to the execution of the warrant occurred."  *Bender v. Alvarez*, No. 06-CV-3378, 2009 WL 112716, at *7 (E.D.N.Y. Jan. 16, 2009) (internal quotation marks omitted).  Here, Plaintiffs allege that Defendants "destroy[ed] much of [their] property," (FAC ¶ 10), which plausibly states a claim that "the officers damaged [P]laintiffs' property to an extent beyond what was necessary to effectuate a complete search of the [r]esidence, pursuant to the terms of the [w]arrant," *Lynch*, 567 F. Supp. 2d at 467 n.5.  Therefore, Plaintiffs plausibly plead a claim that the search was unreasonable on this ground.

Third, Plaintiffs allege that the no-knock entry into the apartment was unreasonable. Here, Plaintiffs allege that Scott, Fox, and Kushner "broke down the door to Plaintiff[s'] apartment without any prior warning."  (FAC ¶ 10.)  "[T]he Fourth Amendment . . . ordinarily requires that police officers knock on the door and announce their identity and purpose before attempting forcible entry."  *United States v. Brown*, No. 99-CR-621, 1999 WL 813419, at *2 (S.D.N.Y. Oct. 12, 1999).  "In order to justify a 'no-knock' entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular

circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of

the crime by, for example, allowing the destruction of evidence." *Richards v. Wisconsin*, 520

U.S. 385, 394 (1997); *see also United States v. Ramirez*, 523 U.S. 65, 67–68 (1998) (noting that

the standard is the same even when the no-knock entry results in the destruction of property).

That law enforcement officials are investigating narcotics-related conduct does not categorically

condone a no-knock entry. *See Richards*, 520 U.S. at 394 (holding that "the fact that felony drug

investigations may frequently present circumstances warranting a no-knock entry" does not

mean that such entries are categorically allowed).

 "[T]he issuance of a warrant with a no-knock provision potentially insulates the police

against a subsequent finding that exigent circumstances . . . did not exist." *United States v.

Tisdale*, 195 F.3d 70, 72 (2d Cir. 1999).  Here, the warrant explicitly provides: "You are

therefore commanded at any hour of the day or night, without first announcing your purpose or

authority, to make a search of the above listed Premises and person(s) for cocaine as described in

Penal Law Sections 220.00."  (Search Warrant at unnumbered 2.)[10]  "Because the affidavit

contained indicia pointing to the existence of particularized exigent circumstances, the officers'

reliance on it was, at the least, not entirely unreasonable." *Tisdale*, 195 F.3d at 73 (internal

quotation marks omitted); *see also Rodriguez v. Butler*, 536 F.2d 982, 987 (2d Cir. 1976)

("Arguably the presence of easily disposable contraband without more constitutes a sufficient

exigency to justify no-knock entry.").  This is true even if it is later determined that the issuing

judicial officer should not have issued the no-knock warrant. *See Bancroft*, 672 F. Supp. 2d at

403 n.5 ("Because a neutral magistrate issued a warrant authorizing a no-knock search of [the

---

 [10] Furthermore, the Fegan Affidavit describes contraband in a readily disposable form—
namely twists of cocaine.  (Fegan Affidavit at unnumbered 3–4.)

apartment], it was objectively reasonable for the officers who executed that warrant to do so—even if the magistrate ought not to have issued the warrant in the first place.  It certainly cannot be said that no reasonable police officer would have thought the warrant valid and proceeded to execute it on that assumption."); *United States v. Simmons*, No. 02-CR-314, 2003 WL 145261, at *10 (E.D.N.Y. Jan. 9, 2003) ("Whether or not [the judge] should have authorized the no-knock entry based on the evidence before him, the fact that he did authorize it made the officers reliance on the warrant objectively reasonable.").  Therefore, the Defendant Police Officers are entitled to qualified immunity with regard to this claim.

Fourth, Plaintiffs allege that the Defendant Police Officers "strip search[ed]" Green twice.  (*Id.* ¶ 15.)  Plaintiffs first allege that McKennie forced Green to strip off all of her clothing, and that Jane Doe and McKennie performed two vaginal searches of Plaintiff, (*id.* ¶ 10), and later alleged that Jane Doe alone performed a vaginal search at the direction of Scott, (*id.* ¶ 37).  A valid search warrant "creates a presumption of reasonableness regarding an attendant search."  *Bolden v. Village of Monticello*, 344 F. Supp. 2d 407, 417 (S.D.N.Y. 2004).  However, the attendant search must still be reasonable.  "[A]n officer who conducts a strip search is entitled to qualified immunity if officers of reasonable competence in the same circumstances and with the same knowledge could disagree whether a strip search was constitutionally justified."  *Sarnicola v. County of Westchester*, 229 F. Supp. 2d 259, 275 (S.D.N.Y. 2002).

As alleged, Plaintiffs have stated a plausible claim that the strip search was unreasonable.  To begin, "it is clear that the existence of a warrant authorizing the search of a person or persons, without more, does not justify the extraordinary invasion of privacy caused by a strip search, let alone a visual or invasive body cavity search."  *Bolden*, 344 F. Supp. 2d at 417; *see also Rivera*,

928 F.2d at 606 ("Mere possession of a search warrant . . . will not normally authorize strip searches of the occupants of the premises."); *Thomas v. O'Brien*, No. 08-CV-318, 2010 WL 3155817, at *10 (N.D.N.Y. Aug. 9, 2010) ("It is well established that strip searches require particular justification."); *Howard v. Schoberle*, 907 F. Supp. 671, 680 (S.D.N.Y. 1995) ("While strip searches have been upheld as reasonable, the obvious intrusiveness of such a search must be justified by some particularized suspicion that the person searched has committed a crime and may possess weapons or contraband." (citation omitted)).  Indeed, the Second Circuit "has exhibited considerable regard for the right of any person—even a person who has been lawfully arrested and confined in a correctional facility pending trial—not to be subjected to a strip search unless there exists particularized suspicion that an individual is secreting contraband." *Bolden*, 344 F. Supp. 2d at 417 (citing *N.G. v. Connecticut*, 382 F.3d 225, 239 (2d Cir. 2004); *Wachtler v. County of Herkimer*, 35 F.3d 77 (2d Cir. 1994); *Walsh v. Franco*, 849 F.2d 66 (2d Cir. 1988); *Weber v. Dell*, 804 F.2d 796 (2d Cir. 1986)); *see also Wachtler*, 35 F.3d at 81 ("The Fourth Amendment precludes prison officials from performing strip/body cavity searches of arrestees charged with misdemeanors or other minor offenses unless the officials have a reasonable suspicion that the arrestee is concealing weapons or other contraband based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest." (brackets and internal quotation marks omitted)).  Furthermore, "no court has ever held that being arrested for a narcotics-related crime automatically gives rise to reasonable suspicion that drugs are being carried in an arrestee's body cavities, so as to justify a strip search or visual body cavity inspection." *Sarnicola*, 229 F. Supp. 2d at 273.  In fact, "[t]he Second Circuit has held that an arrest for a misdemeanor drug offense, alone, is insufficient to satisfy the reasonable suspicion requirement," and "[t]he same rule applies to felony narcotics arrestees." *Sims v.*

32

*Farrelly*, No. 10-CV-4765, 2013 WL 3972460, at *7–8 (S.D.N.Y. Aug. 2, 2013) (citing *Hartline v. Gallo*, 546 F.3d 95, 100 (2d Cir. 2008)).

Here, Plaintiffs allege that the Defendant Police Officers did not levy any criminal charges as a result of the search, nor did they find any drugs or the two individuals referred to in the warrant.  (*See* FAC ¶ 10.)  In such a case, where "narcotics were not recovered during [the] initial sweep [of the apartment], it [is] unreasonable to immediately suspect that the occupants of the apartment—none of whom were identified in the warrant—might be in possession of either narcotics or weapons."  *Howard*, 907 F. Supp. at 680.  It is even plausibly more unreasonable to conduct a *second* strip search on Green, after the first one revealed nothing, when Green was allegedly handcuffed during the search of the apartment.  *Cf. Jean-Laurent v. Wilkerson*, 438 F. Supp. 2d 318, 323 (S.D.N.Y. 2006) ("The second search . . . is much more dubious.  According to the complaint, [the plaintiff] was under constant supervision by [the] [d]efendants from the time of the first strip search to the second.  Since he had no opportunity to acquire contraband during the supervised period, the second search as alleged served no legitimate correctional purpose."), *aff'd*, 461 F. App'x 18 (2d Cir. 2012).  Though Defendants may very well establish that the strip searches were not unconstitutional or that they were entitled to qualified immunity at summary judgment, Plaintiffs plausibly plead a claim for unreasonable search regarding the strip searches.

### b.  Trespass claim

Plaintiffs also allege a state common law trespass claim.  (FAC ¶¶ 11, 23, 51, 52.)  "Under New York law, trespass is the intentional invasion of another's property."  *Scribner v. Summers*, 84 F.3d 554, 557 (2d Cir. 1996).  "The requisite elements for a claim of trespass are the intentional entry by defendants on to plaintiffs' land and the wrongful use without

justification or consent." *Matthews v. Malkus*, 377 F. Supp. 2d 350, 359 (S.D.N.Y. 2005)

(discussing New York law); *see also N.Y. State Energy Research & Dev. Auth. v. Nuclear Fuel

Servs., Inc.*, 561 F. Supp. 954, 974 (W.D.N.Y. 1983) ("A trespasser, to be such, need not intend

harm to or unlawful interference with the other's property and may in good faith believe that he

or she or it is in some way entitled to enter or remain upon the property.").  Defendants argue

that this claim fails because the Officers were acting with justification, as they were acting

pursuant to a search warrant.  (Reply Mem. of Law in Further Supp. of Defs.' Mot. To Dismiss

Pursuant to Rule 12(b)(6) ("Defs.' Reply") at unnumbered 7 (Dkt. No. 57).)  However, as

explained above, Plaintiffs have adequately alleged that the Defendant Police Officers' presence

in Plaintiffs' home was no longer privileged at the point that they allegedly knew they were in

the wrong location, and therefore, Plaintiffs adequately pleaded a claim for trespass when the

Defendant Police Officers allegedly knew they were in the wrong location but did not leave.  *See

Evans v. Solomon*, No. 06-CV-3284, 2011 WL 609806, at *5 n.1 (E.D.N.Y. Feb. 15, 2011)

(holding that "New York cases support the proposition that a law enforcement officer's privilege

remains limited to constitutional searches and seizures" (internal quotation marks omitted));

*Dockery v. Tucker*, No. 97-CV-3584, 2008 WL 2673307, at *11 (E.D.N.Y. June 26, 2008)

("[U]nder New York law, an officer has a privilege to trespass upon property, pursuant to an

arrest warrant, if the entry comports with constitutional limitations."); *Voskerchian v. United

States,* No. 98–CV–335, 1999 WL 66709, at *4 (W.D.N.Y. Feb.10, 1999) ("[A] law enforcement

officer's privilege remains limited to constitutional searches and seizures." (citing *People v.

Johnson,* 488 N.E.2d 439, 450 (N.Y. 1985); *1090 Jericho Corp. v. Elias,* 559 N.Y.S.2d 358, 361

(App. Div. 1990)).  Therefore Defendants' Motion To Dismiss the state law trespass claim is

denied.

34

<u>c.  Unreasonable Seizure and False Arrest/False Imprisonment Claim</u>

Plaintiffs claim that Scott, Fox, and Kushner improperly "handcuffed and arrested" Green.  (FAC ¶ 10; *see also id.* ¶ 15.)  Plaintiffs also allege that after the Defendant Police Officers realized they were in the wrong apartment they "fail[ed] . . . to . . . release" Green.  (*Id.* ¶ 18; *see also id.* ¶ 51 ("These Police Officers had knowledge that Plaintiffs committed no crime once they knew and admitted that they were in the wrong apartment, but they continued the acts complained of.").)  The Court notes that while Plaintiffs use the word "arrest" in describing what happened, Plaintiffs seem to be using that term as a synonym for "detain," as Plaintiffs merely describe that Green was handcuffed for the duration of the search.  Plaintiffs further allege that they "objected to and were conscious of the confinement at gun point by the Police, and [that the] confinement was not privileged under th[e] invalid search warrant."  (*Id.* ¶ 49.)

Defendants do not argue that they had probable cause to arrest Green, but rather that the Defendant Police Officers were allowed to detain Green while carrying out the search or, at the very least, are entitled to qualified immunity on that ground.  The Supreme Court has held that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted."  *Michigan v. Summers*, 452 U.S. 692, 705 (1981) (footnote omitted); *see also Muehler v. Mena*, 544 U.S. 93, 98 (2005) ("An officer's authority to detain incident to a search is categorical; it does not depend on the quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.  Thus, [the plaintiff's] detention for the duration of the search was reasonable under *Summers* because a warrant existed to search [the property] and she was an occupant of that address at the time of the search." (citation and internal quotation marks omitted)); *Rivera*, 928 F.2d at 606 ("Absent special circumstances, the police of course have the authority to detain

occupants of premises while an authorized search is in progress, regardless of individualized suspicion.").  Thus, generally, Defendants would be acting lawfully if they detained Green incident to a valid search valid warrant or would be shielded by qualified immunity if they acted with good faith reliance on the apparently valid warrant.  However, if Defendants knew they were in the wrong location, the search was no longer constitutional, and thus the continued confinement of Green during that unconstitutional search was no longer constitutional, nor could a reasonable officer think otherwise.  *Cf. Harman*, 446 F.3d at 1086 (noting that "as with any authority bestowed by a search warrant, be it categorical or otherwise, that authority terminates when an officer[] knows or reasonably should know that the warrant is overbroad" (brackets and internal quotation marks omitted)).  Therefore, Defendants' Motion To Dismiss Plaintiffs' unreasonable seizure claim is denied.

A "§ 1983 claim for false arrest derives from [the] Fourth Amendment right to remain free from unreasonable seizures, which includes the right to remain free from arrest absent probable cause." *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006); *see also Widget v. Town of Poughkeepsie*, No. 12-CV-3459, 2013 WL 1104273, at *4 (S.D.N.Y. Mar. 18, 2013) (same).  "In analyzing § 1983 claims for unconstitutional false arrest, [courts] have generally looked to the law of the state in which the arrest occurred." *Jaegly*, 439 F.3d at 151 (internal quotation marks omitted); *see also Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) ("A § 1983 claim for false arrest . . . is substantially the same as a claim for false arrest under New York law." (internal quotation marks omitted)).[11]  Under New York Law, which is applicable here, "an

---

[11] "In New York, the tort of false arrest is synonymous with that of false imprisonment." *Posr v. Doherty*, 944 F.2d 91, 96 (2d Cir. 1991); *see also Williams v. City of Mount Vernon*, 428 F. Supp. 2d 146, 157 (S.D.N.Y. 2006) (same).  The only difference between § 1983 claims for false arrest and New York claims for false arrest or false imprisonment is that, under § 1983 the

action for false arrest requires that the plaintiff show that '(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement[,] and (4) the confinement was not otherwise privileged.'" *Ackerson*, 702 F.3d at 19 (quoting *Broughton v. State*, 335 N.E.2d 310, 314 (N.Y. 1975)).  As explained above, though the Defendant Police Officers are, at the very least, entitled to qualified immunity for the handcuffing of Green during the first portion of the search, at the point that the Defendant Police Officers allegedly knew they were searching the wrong location, the seizure of Green was no longer privileged, nor were the Officers entitled to immunity.  Therefore, Defendants' Motion To Dismiss the false arrest/false imprisonment claim is denied.

### d.  Excessive Force, Assault, and Battery

Plaintiffs allege that Scott, Fox, and Kushner broke down the door to Plaintiffs' apartment without prior warning, entered the apartment with guns drawn, and threatened bodily harm to Plaintiffs if they did not comply with police demands.  (FAC ¶ 10; *see also id.* ¶ 27 (alleging that Scott, Fox, and Kmiotek[12] "intentionally placed [Plaintiffs] in fear of imminent harm or contact" when they drew their guns, pointed the guns at all three Plaintiffs, and threatened them with immediate harm (internal quotation marks omitted)).)  Additionally, Plaintiffs allege that Scott, Fox, and Kushner handcuffed Green and separated her from her children.  (*Id.* ¶ 10.)  Plaintiffs do not allege that any of these actions took place after Scott allegedly told Green that they were in the wrong apartment.

---

"tortfeasor [must] act under color of state law."  *Williams*, 428 F. Supp. 2d at 157 (internal quotation marks omitted).

[12] It is not clear if Plaintiffs meant to refer to Kmiotek in paragraph 10 of the FAC, or if they meant to refer to Kushner in paragraph 27.

"Assault and battery claims, when alleged against a police officer, are evaluated like excessive force claims." *Brown v. City of New York*, No. 11-CV-1068, 2013 WL 491926, at *10 (S.D.N.Y. Feb. 8, 2013); *see also Posr v. Doherty*, 944 F.2d 91, 94–95 (2d Cir. 1991) (holding that "except for § 1983's requirement that the tort be committed under color of state law," the "essential elements" of "§ 1983 use of excessive force and state law assault and battery" are "substantively identical"). "Application of physical force is excessive when it is more than is necessary under the circumstances." *Brown*, 2013 WL 491926, at *10. Qualified immunity may also be a defense to an excessive force claim. In this context, "the question for the purposes of qualified immunity is whether a reasonable officer could have believed that the use of force alleged was objectively reasonable in light of the circumstances." *Usavage v. Port Auth. of N.Y. & N.J.*, 932 F. Supp. 2d 575, 594 (S.D.N.Y. 2013) (internal quotation marks omitted).

When considering whether handcuffing constitutes excessive force, a court "is to consider evidence that: 1) the handcuffs were unreasonably tight; 2) the defendants ignored the arrestee's pleas that the handcuffs were too tight; and 3) the degree of injury to the wrists." *Usavage*, 932 F. Supp. 2d at 592 (internal quotation marks omitted); *see also Pelayo v. Port Auth.*, 893 F. Supp. 2d 632, 642 (S.D.N.Y. 2012) (same). Additionally, "there is a consensus among courts in [the Second Circuit] that tight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort." *Usavage*, 932 F. Supp. 2d at 592 (brackets and internal quotation marks omitted). "These injuries need not be severe or permanent, but must be more than merely de minimis." *Id.* (citation and internal quotation marks omitted). Plaintiffs do not allege that Green was injured as a result of the handcuffing, that the handcuffs were unreasonably tight, or that Green informed the Police Officer Defendants that the

handcuffs were unreasonably tight.  Therefore, she fails to state an excessive force claim based on the handcuffing.

Additionally, Plaintiffs fail to state an excessive force claim arising out of their allegations that the Officers entered the apartment with guns drawn because either the Officers were acting pursuant to a valid warrant for a drug-related search or were relying in good faith on an apparently valid warrant for a drug-related search at the time they entered.  Under case law in this District, "[i]n executing a search warrant for drugs, as in this case, it is reasonable for police officers to enter a residence with guns drawn to secure the area and prevent harm to themselves or others."  *Bolden*, 344 F. Supp. 2d at 419; *see also Hollins v. City of New York*, No. 10-CV-1650, 2014 WL 836950, at *9 (S.D.N.Y. Mar. 3, 2014) (holding that "[b]ecause police officers have a legitimate safety concern when initially sweeping and securing a residence during the execution of a search warrant, it was objectively reasonable for [the] [d]efendants to place the [p]laintiff at gunpoint while effectuating the search warrant"); *Abdul-Rahman v. City of New York*, No. 10-CV-2778, 2012 WL 1077762, at *8 (E.D.N.Y. Mar. 30, 2012) (holding that it is "reasonable for officers to draw their weapons when entering a residence they reasonably believe to be used for drug trafficking and reasonable for officers to sometimes aim that weapon at an individual until an assessment can be made as to whether the individual poses a threat"); *Askins v. City of New York*, No. 09-CV-10315, 2011 WL 1334838, at *3 (S.D.N.Y. Mar. 25, 2011) ("It is not objectively unreasonable for police officers to merely point a gun when executing a search warrant at a private residence.").  Though it is less clear whether pointing guns at children when effecting a search warrant related to narcotics constitutes excessive force, at the very least the Police Officer Defendants are entitled to immunity on this claim because, based on the sparse allegations in the FAC, their conduct did not violate clearly established constitutional rights of

which a reasonable person would have known.  *See Anderson v. United States*, 107 F. Supp. 2d

191, 199 (E.D.N.Y. 2000) (considering a claim that the "agents['] drawing of weapons on the

children constituted excessive force," where FBI agents were effecting an arrest warrant on

someone they reasonably believed was armed and dangerous, and holding, "as a matter of law,

[that] the drawing of weapons during the incident by the FBI agents was objectively reasonable

and did not constitute an excessive use of force"); *see also Pina v. City of Hartford*, No. 07-CV-

657, 2009 WL 1231986, at *3, *8 (D. Conn. Apr. 29, 2009) (holding that "the fact that the

officers had their guns drawn and pointed at the plaintiffs is not unreasonable during the

execution of a search warrant" where there was evidence that "one of the detectives put the

barrel of a gun" in the face of a sleeping child).  Moreover, it is possible that verbal threats,

combined with the brandishing of the weapon, could be unreasonable and therefore constitute

excessive force, but Plaintiffs have not pleaded any facts to support such a theory, instead merely

asserting that they were threatened with immediate harm, in a conclusory fashion.  (*See* FAC

¶ 27 (asserting that the Police Officer Defendants "threatened each Plaintiff with immediate

harm").)  *Cf. Kerman v. City of New York*, 261 F.3d 229, 233, 239–40 (2d Cir. 2001) (holding

that a statement by a police officer of "Listen you fucking nut-job, just hold still or I'll blow your

brains out," could constitute verbal abuse that was "objectively unreasonable and therefore

excessive" (internal quotation marks omitted)).

### e.  Negligent Supervision

Plaintiffs allege that "[a]s a result of the wrongful acts of their named

employees . . . [Mount Vernon] is guilty of negligently supervising their employees causing

property damage to Plaintiffs' property."  (FAC ¶ 36.)  It therefore appears that Plaintiffs attempt

40

to plead a state law negligent supervision claim, in addition to a *Monell* claim based on inadequate supervision.

"To state a claim for negligent supervision or retention under New York law, in addition to the standard elements of negligence, a plaintiff must show: (1) that the tort-feasor and the defendant were in an employee-employer relationship, (2) that the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence, and (3) that the tort was committed on the employer's premises or with the employer's chattels. *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (citations and internal quotation marks omitted); *see also Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 94 (2d Cir. 2011) (same). Plaintiffs fail to plead *any* facts that could plausibly state a claim that Mount Vernon knew or should have known of the Defendant Police Officers' propensity for the conduct in question here. *See Zeak v. United States*, No. 11-CV-4253, 2015 WL 246340, at *4 (S.D.N.Y. Jan. 20, 2015) (holding that one ground for dismissal of the plaintiff's negligent hiring and retention claim was that the plaintiff "did not even allege the requisite knowledge in her [c]omplaint"); *Manno v. Mione*, 670 N.Y.S.2d 368, 369 (App. Div. 1998) (affirming dismissal of a negligent supervision claim where the complaint "contains little more than bare legal conclusions" (internal quotation marks omitted)); *Khaldarov v. Neighborhood Hous. Serv. of N.Y.C.*, No. 553/2004, 798 N.Y.S.2d 710 (Sup. Ct. Apr. 29, 2004) ("The plaintiff's complaint fails to state a cause of action for negligent supervision as there are no facts nor simply even an allegation that the defendant knew or should have known of [the employee's] propensity for the conduct the plaintiff alleges led to his injuries."). Plaintiffs' conclusory assertion that Mount Vernon is "guilty of negligently supervising their employees

causing . . . damage to Plaintiffs' property" is not enough.  (FAC ¶ 36.)  Therefore, this claim is dismissed.

### f.  Negligent or Intentional Infliction of Emotional Distress

Plaintiffs also allege that Mount Vernon, "by [its] existing customs has negligently or intentionally caused personal injuries and traumatic emotional distress."  (FAC ¶ 41.)  Plaintiffs further allege that Defendants' actions "were extreme, outrageous, and . . . exceeded any bounds of decency."  (*Id.* ¶ 44.)

"Under New York law, a claim of negligent infliction of emotional distress requires a showing of (1) extreme and outrageous conduct, (2) a causal connection between the conduct and the injury, and (3) severe emotional distress."  *Carabello v. N.Y.C. Dep't of Educ.*, 928 F. Supp. 2d 627, 645–46 (E.D.N.Y. 2013).  Similarly, a claim for intentional infliction of emotional distress under New York law requires "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress."  *Garrison v. Toshiba Bus. Solutions (USA), Inc.*, 907 F. Supp. 2d 301, 307 (E.D.N.Y. 2012) (internal quotation marks omitted).  For either claim, "[t]he conduct forming the basis of the claim must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."  *Id.* (internal quotation marks omitted) (discussing intentional infliction of emotional distress); *see also Carabello*, 928 F. Supp. 2d at 646 (holding the same with regard to negligent infliction of emotional distress).

Defendants argue that the facts as alleged by Plaintiffs cannot constitute "extreme and outrageous [conduct], such that it exceeds the bounds of decency."  (Defs.' Mem. 17–18.)  However, an unlawful strip search, which is alleged by Plaintiffs, can constitute extreme and

outrageous conduct. *See Dzwonczyk v. Syracuse City Police Dep't*, 710 F. Supp. 2d 248, 273–74 (N.D.N.Y. 2008) ("[A]n unlawful strip search, without more, may be considered extreme and outrageous conduct"); *see also Jean-Laurent v. Hennessy*, No. 05-CV-1155, 2008 WL 3049875, at *20 (E.D.N.Y. Aug. 1, 2008) (denying summary judgment where there was evidence that the plaintiff "was slammed against his car while handcuffed and publicly strip searched with no justification"); *Mejia v. City of New York*, 119 F. Supp. 2d 232, 286–87 (E.D.N.Y. 2000) (denying summary judgment motion in part because of evidence that a defendant ordered "an unjustified strip search"); *Johnson v. Harron*, No. 91-CV-1460, 1995 WL 319943, at *33 n.47 (N.D.N.Y. May 23, 1995) (noting that strip searches may "arguably . . . satisfy the element of [the] plaintiff's claim that requires that the complained of conduct be utterly intolerable in a civilized society"), *on reconsideration in part*, 1995 WL 411175 (N.D.N.Y. July 6, 1995). Thus, the Court turns to the other requirements for stating negligent and/or intentional infliction of emotional distress claims.

"Under New York law, a plaintiff may establish a claim for negligent infliction of emotional distress in one of two ways: (1) the bystander theory; or (2) the direct duty theory." *Baker v. Dorfman*, 239 F.3d 415, 421 (2d Cir. 2000) (brackets and internal quotation marks omitted); *see also Vaughn v. Am. Multi Cinema, Inc.*, No. 09-CV-8911, 2010 WL 3835191, at *5 (S.D.N.Y. Sept. 13, 2010) (same); *Busch v. City of New York*, No. 00-CV-5211, 2003 WL 22171896, at *8 (E.D.N.Y. Sept. 11, 2003) (same). Both theories require "physical injury or the threat of danger, either to the plaintiff [her]self or to a close family member." *Vaughn*, 2010 WL 3835191, at *5. First, Plaintiffs fail to meet this fundamental requirement, as Plaintiffs do not plead any physical injury or threat of danger to Green or her children in connection with the strip search, which is the only conduct alleged that even arguably rises to the level of extreme and

outrageous conduct to meet the first requirement.  And while Plaintiffs do allege such threat of

danger with regard to the Defendant Police Officers' entry with guns drawn, this conduct cannot

form the basis of a claim for negligent infliction of emotional distress because such action does

not rise to the level of extreme and outrageous conduct.

Furthermore, Plaintiffs fail to state a plausible claim under either the bystander theory or

the direct duty theory.  First, the bystander theory, provides for liability when

> a defendant's conduct is negligent as creating an unreasonable risk of bodily harm
> to a plaintiff and such conduct is a substantial factor in bringing about injuries to
> the plaintiff in consequence of shock or fright resulting from his or her
> contemporaneous observation of serious physical injury or death inflicted by the
> defendant's conduct on a member of the plaintiff's immediate family in his or her
> presence.

*Baker*, 239 F.3d at 421.  Plaintiffs fail to state a claim under the bystander theory because

Plaintiffs do not allege that serious physical injury or death was inflicted by a Defendant on any

member of Plaintiffs' immediate family in their presence.

Alternatively, "[u]nder the direct duty theory," a plaintiff can state a claim for negligent

infliction of emotional distress where she "suffers emotional distress caused by defendant's

breach of a duty which unreasonably endangered [the] plaintiff's own physical safety."  *Id.*

(brackets and internal quotation marks omitted); *see also Rivers v. Towers, Perrin, Forster &*

*Crosby Inc.*, No. 07-CV-5441, 2009 WL 817852, at *10 (E.D.N.Y. Mar. 27, 2009) ("Though a

physical injury is no longer a prerequisite for a negligent infliction of emotional distress claim,

there must be breach of a duty owed to plaintiff which either unreasonably endangers the

plaintiff's physical safety, or causes the plaintiff to fear for his or her own safety." (internal

quotation marks omitted)).  Under this theory, "'[t]he duty . . . must be specific to the plaintiff,

and not some amorphous, free-floating duty to society.'"  *Busch*, 2003 WL 22171896, at *8 n.8

(second alteration in original) (quoting *Mortise v. United States*, 102 F.3d 693, 696 (2d Cir.

1996)).  Plaintiffs have alleged no such duty that the Defendant Police Officers specifically owed

them, and therefore they fail to state a claim under the direct duty theory.  *See Sylvester v. City of*

*New York*, No. 106800/03, 889 N.Y.S.2d 508 (Sup. Ct. June 4, 2009) (dismissing a claim for

negligent infliction of emotional distress arising out of an alleged false arrest because "the [c]ity

did not owe plaintiffs any special duty," and therefore the "claim fails as a matter of law").

Plaintiffs have not raised, nor has the Court found in its own research, any case suggesting that

police officers have a special duty to people who are being searched as a matter of New York

law.  *Cf. Mortise v. United States*, 102 F.3d 693, 696–97 (2d Cir. 1996) (holding that the

National Guard "may have had a generalized duty to prevent unreasonable risks of harm" to

people passing by a field training exercise, but "this duty was not specific" to individuals who

happened to roam into the area, and rejecting a theory that the plaintiffs were third party

beneficiaries of a contract between the county and the federal government); *Scheuer v. City of*

*New York*, 780 N.Y.S.2d 597, 599 (App. Div. 2004) (holding no special duty for negligent

infliction of emotional distress purposes between the police department and a family where the

police officers made affirmative representations to the family that they conducted a proper search

for a 91-year-old relative).  Moreover, even assuming that the Officers had a special duty to

Plaintiffs, this claim still fails because the "breach of [the] duty" did not either "unreasonably

endanger[] [Green's] physical safety, or cause[] [her] to fear for . . . her own safety."  *Rivers*,

2009 WL 817852, at *10 (internal quotation marks omitted).  Therefore Plaintiffs' claim for

negligent infliction of emotional distress is dismissed.

Finally, the Court notes that, to the extent that Plaintiffs attempt to assert an intentional

infliction of emotional distress claim against Mount Vernon, that claim cannot proceed, as

"under New York law, 'public policy bars claims sounding in intentional infliction of emotional

distress against a governmental entity.'"  *D'Angelo-Fenton v. Town of Carmel*, 470 F. Supp. 2d

387, 399 (S.D.N.Y. 2007) (quoting *Wyllie v. Dist. Att'y of Cnty. of Kings*, 770 N.Y.S.2d 110, 115

(App. Div. 2003)); *see also Rodgers v. City of New York*, 966 N.Y.S.2d 466, 469 (App. Div.

2013) (same and collecting cases), *leave to appeal denied,* 995 N.E.2d 1159 (N.Y. 2013).

Therefore, that claim is dismissed.  However, the Court holds that Plaintiffs have adequately

pleaded the other elements of an intentional infliction of emotional distress claim against the

Police Officer Defendants, that Defendants "either intentionally or recklessly caused [their]

emotional suffering." *Bradley v. Nat'l R.R. Passenger Corp. ("Amtrak")*, 797 F. Supp. 286, 294

(S.D.N.Y. 1992); *see also Hoffman v. County of Delaware*, 41 F. Supp. 2d 195, 217 (N.D.N.Y.

1999) (noting that a plaintiff must allege "intent to cause, or reckless disregard of a substantial

probability of causing, severe emotional distress"), *aff'd*, 205 F.3d 1323 (2d Cir. 2000).  For the

above reasons, the negligent infliction of emotional distress claim is dismissed, as is the

intentional infliction of emotional distress claim as against Mount Vernon.

### g.  Municipal Liability Claims Against Mount Vernon

Finally, Plaintiffs bring claims against Mount Vernon pursuant to § 1983, alleging that

the municipality is liable for the allegedly unconstitutional conduct asserted in the FAC.  "To

state a claim under [§ 1983], the plaintiff must show that a defendant, acting under color of state

law, deprived him of a federal constitutional or statutory right." *Sykes v. Bank of Am.*, 723 F.3d

399, 405–06 (2d Cir. 2013).  "Congress did not intend municipalities to be held liable [under

§ 1983] unless action pursuant to official municipal policy of some nature caused a constitutional

tort." *Monell*, 436 U.S. at 691.  Thus, "to prevail on a claim against a municipality under section

1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under

color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and

(5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008); *cf. Salvatierra v. Connolly*, No. 09-CV-3722, 2010 WL 5480756, at \*10 (S.D.N.Y. Sept. 1, 2010) (dismissing a claim against agencies where the plaintiff did not allege that any policy or custom caused the deprivation of his rights), *adopted by* 2011 WL 9398 (S.D.N.Y. Apr. 16, 2010); *Arnold v. Westchester County*, No. 09-CV-3727, 2010 WL 3397375, at \*9 (S.D.N.Y. Apr. 16, 2010) (dismissing a claim against the county because the complaint "[did] not allege the existence of an unconstitutional custom or policy"), *adopted sub nom. Arnold v. Westchester Cnty. Dep't of Corr.*, 2010 WL 3397372 (S.D.N.Y. Aug. 15, 2010). The fifth element reflects the notion that "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cnty. Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403 (1997); *see also Newton v. City of New York*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008) ("As subsequently reaffirmed and explained by the Supreme Court, municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right."). In other words, a municipality may not be liable under Section 1983 "by application of the doctrine of respondeat superior." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (italics omitted); *see also Vassallo v. Lando*, 591 F. Supp. 2d 172, 201 (E.D.N.Y. 2008) (noting that "a municipal entity may only be held liable where the entity *itself* commits a wrong"). Instead, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("[G]overnmental bodies can act only through natural persons . . . [and] governments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights.").

"In determining municipal liability, it is necessary to conduct a separate inquiry into whether there exists a 'policy' or 'custom.'" *Davis v. City of New York*, 228 F. Supp. 2d 327, 336 (S.D.N.Y. 2002), *aff'd*, 75 F. App'x 827 (2d Cir. 2003). A plaintiff may satisfy the "policy or custom" requirement by alleging the existence of "(1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." *Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted).

Normally, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [municipality]." *Newton*, 566 F. Supp. 2d at 271; *see also City of Okla. v. Tuttle*, 471 U.S. 808, 823–24 (1985) (plurality opinion) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation."). In the end, therefore, "a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury." *Roe*, 542 F.3d at 37 (quoting *Brown*, 520 U.S. at 404); *see also Tuttle*, 471 U.S. at 824 n.8 ("The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to

satisfy *Monell's* requirement that the particular policy be the 'moving force' behind a *constitutional* violation.  There must at least be an affirmative link between[, for example,] the training inadequacies alleged, and the particular constitutional violation at issue."); *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) ("Absent a showing of a causal link between an official policy or custom and the plaintiffs' injury, *Monell* prohibits a finding of liability against the [c]ity."); *Johnson v. City of New York*, No. 06-CV-9426, 2011 WL 666161, at *3 (S.D.N.Y. Feb. 15, 2011) (noting that after demonstrating the existence of a municipal policy or custom, "a plaintiff must establish a causal connection—an affirmative link—between the policy and the deprivation of his constitutional rights" (internal quotation marks omitted)).

At this stage, of course, Plaintiffs need not prove these elements, but still must plead them sufficiently to make out a plausible claim for relief.  Although there is no heightened pleading requirement for complaints alleging municipal liability under § 1983, *see Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 168 (1993), a complaint does not "suffice if it tenders naked assertion[s] devoid of further factual enhancement," *Iqbal,* 556 U.S. at 678 (alteration in original) (internal quotation marks omitted). Thus, to survive a motion to dismiss, Plaintiffs cannot, through conclusory allegations, merely assert the existence of a municipal policy or custom, but "must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists."  *Santos v. New York City*, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012) (citing *Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir. 1993)).

Plaintiffs' FAC exclusively contains quintessentially boilerplate language echoing the requirements contained in *Monell*.  (*See, e.g.*, FAC ¶ 16 (alleging that police officers were "engaged in . . . the custom of the Mt. Vernon Police Department in search warrant cases

including to arrest and confine individuals for prolonged periods on 'open' charges, holding

Plaintiffs incommunicado and punishing them by imprisonment without trial while conducting

their search of Plaintiff[s'] premises"); *id.* ¶ 17 (alleging actions were taken by the police "under

a color of existing ordinances, regulations, customs and usage of the State of New York

subjecting Plaintiffs . . . [to] the deprivation of their right, privileges and immunities secured to

them by the U.S. Constitution"); *id.* ¶ 19 ("These acts by said named Police Officers were done

by executing a Government Policy and/or custom[] inflicting the injuries and deprivation of

constitutional rights to Plaintiffs.  Said actions are unconstitutional since they are a policy

statement, ordinance and/or regulation, a decision officially adopted or promulgated by the City

of Mt. Vernon as official policy; and the named Mt. Vernon Police represented said policy when

inflicting injury on Plaintiffs."); *id.* ¶ 30 (alleging that the pleaded facts "exhibit a custom of the

Mt. Vernon Police Department in search warrant cases"); *id.* (alleging that the acts taken "by the

named Mt. Vernon Police Officers acting in their official capacities, performing their duties[,]

were committed under the color of existing ordinances, regulations, custom[,] and usage of [t]he

State of New York, and the City of Mt. Vernon[,] subjecting Plaintiffs to the deprivation of the

rights, privileges, and immunities secured to them by the U.S. Constitution"); *id.* ¶ 31 (alleging

that the officers' actions "exhibit a governmental policy and/or custom[] as the facts are applied

to the 'total circumstances' of this case"); *id.* ¶ 39 ("The City of Mt. Vernon is liable under

§1983 and under New York Law for failing to properly supervise these named Police Officers

who were acting in their official capacities under the custom and usage of Mount Vernon of Mt.

Vernon.").)  To be blunt, these allegations fall far short of what is needed to plausibly plead a

*Monell* claim.  For example, while Plaintiffs claim the conduct here was done pursuant to

"ordinances" and "regulations," Plaintiffs do not identify any specific provision.  Nor do

Plaintiffs offer *any* allegations to support their assertion of a Mount Vernon custom of executing lawless warrants or using excessive force.  As such, these conclusory allegations "must be disregarded."  *Simms v. City of New York,* No. 10-CV-3420, 2011 WL 4543051, at *3 (E.D.N.Y. Sept. 28, 2011) (dismissing conclusory allegations that did not provide any facts that would allow the court to infer what city policies or practices led to the alleged deficiency, and contained only legal conclusions and boilerplate), *aff'd,* 480 F. App'x 627 (2d Cir. 2012); *see also Triano v. Town of Harrison*, 895 F. Supp. 2d 526, 535–37 (S.D.N.Y. 2012) (holding that "mere allegations of a municipal custom or practice of tolerating official misconduct are insufficient to demonstrate the existence of such a custom unless supported by factual details" and collecting cases); *Duncan v. City of New York,* No. 11-CV-3826, 2012 WL 1672929, at *3 (E.D.N.Y. May 14, 2012) (holding that "boilerplate statements" claiming that New York City had a custom of making and tolerating false arrests and of using excessive force "[were] insufficient to state a claim of municipal liability under *Monell* "); *Moore v. City of New York,* No. 08-CV-8879, 2010 WL 742981, at *6 (S.D.N.Y. Mar. 2, 2010) ("Allegations that a defendant acted pursuant to a policy or custom without any facts suggesting the policy's existence, are plainly insufficient." (internal quotation marks omitted)); *Bradley v. City of New York,* No. 08-CV-1106, 2009 WL 1703237, at *3 (E.D.N.Y. June 18, 2009) ("The [c]omplaint's conclusory, boilerplate language— that the [c]ity 'fail[ed] to adequately train, discipline, and supervise' employees and 'fail[e]d to promulgate and put into effect appropriate rules and regulations applicable to the duties and behavior' of its employees—is insufficient to raise an inference of the existence of a custom or policy, let alone that such a policy caused [the] [p]laintiffs to be arrested without probable cause." (citation omitted)).

Nor do Plaintiffs allege any facts to state a plausible claim that the "challenged action [was] directed by an official with final policymaking authority."  *Mandell v. County of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003); *see also Pembaur*, 475 U.S. at 481 ("Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.").  Although Plaintiffs allege that Scott was supervising the search, (FAC ¶ 37), they do not allege any facts that would allow the Court to plausibly infer that Scott was a final policymaker, *see Powell v. Corr. Med. Care, Inc.*, No. 13-CV-6842, 2014 WL 4229980, at *6 (S.D.N.Y. Aug. 15, 2014) (dismissing a *Monell* claim where the plaintiff "allege[d] no facts suggesting any individual defendant was acting as a policymaker"); *Dilworth v. Goldberg*, 914 F. Supp. 2d 433, 454 (S.D.N.Y. 2012) (dismissing a *Monell* claim because "none of the facts indicate[d] that any of the persons employed by [the defendant] who committed allegedly unconstitutional acts [were] final policymakers," and because "[n]othing in the[] allegations suggest[ed] that the[] doctors were final policymakers of [the defendant] or that their actions constituted official [municipal] policy"); *Lyubeznik v. N.Y.C. Health & Hosps. Corp.*, No. 97-CV-4716, 1998 WL 813407, at *2 (E.D.N.Y. July 29, 1998) (dismissing a *Monell* claim because the plaintiff did not "allege facts which would support a finding that the injury was caused by an existing, unconstitutional municipal policy that [could] be attributed to a municipal policymaker"); *see also Santiago v. Warminster Township*, 629 F.3d 121, 135 n.11 (3d Cir. 2010) (holding that while whether a police chief "is a final policymaker is ultimately a legal rather than a factual question, that does not relieve [the plaintiff] of the obligation to plead in some fashion that [the police chief] had final policy making authority, as that is a key element of a *Monell* claim" (citation omitted)).  There is simply no basis, on the facts alleged by Plaintiffs, for the Court to find that Plaintiffs plausibly alleged that Scott, a police sergeant, had final

policymaking authority with respect to how Mount Vernon police officers were to carry out

searches.  *Cf. Weber v. Dell*, 804 F.2d 796, 803 (2d Cir. 1986) (holding that the "highest ranking

law enforcement official" was the "policy maker" as it relates to "strip searches" (internal

quotation marks omitted)).[13]

Indeed, the only facts asserted by Plaintiffs with regard to any municipal policy come in

the form of Plaintiffs' citation to three cases regarding searches by Mount Vernon police officers

in their Opposition.  Plaintiffs argue that these "constant violations of the civil rights of people

by the Mt. Vernon police shows a custom followed by the Mt. Vernon Police as a policy."

(Mem. of Law in Supp. of Pls.' Opp'n to Defs.' Mot. To Dismiss ("Pls.' Mem.") 13 (Dkt. No.

55).)  However, this is insufficient for several reasons.  First, these facts are asserted in Plaintiffs'

Memorandum of Law, not in the FAC, and as such are not properly considered by the Court in

deciding the Motion To Dismiss.  *See Paul v. Bailey*, No. 09-CV-5784, 2013 WL 2896990, at *5

(S.D.N.Y. June 13, 2013) ("[A]s a general rule, . . . courts should not consider factual allegations

made for the first time in opposition papers."); *Friedman v. MiraMed Revenue Grp., LLC*, No.

12-CV-5328, 2012 WL 5992163, at *3 (S.D.N.Y. Nov. 19, 2012) ("[T]he [c]ourt declines to

consider the additional facts set forth in plaintiff's opposition papers that are not in his

complaint."); *Kalin v. Xanboo, Inc*., 526 F. Supp. 2d 392, 398–99 (S.D.N.Y. 2007) (holding that

a court's analysis under Rule 12(b)(6) "is limited to information contained within the four

corners of the complaint" and that "[w]hen material outside the pleadings is presented in

response to a motion to dismiss, the court must either exclude the additional information and

---

[13] As a matter of New York law, the town board and police board "are the only entities which may be considered responsible for establishing rules and regulations pertaining to police conduct."  *Polite v. Town of Clarkstown*, 120 F. Supp. 2d 381, 384–85 (S.D.N.Y. 2000).

decide the motion on the complaint alone or convert the motion to one for summary judgment"
(internal quotation marks omitted)).

Second, Plaintiffs cite these cases as instances where Mount Vernon police did *not*
violate somebody's rights, and contrast them with this case.  As such, these cases hardly
establish a Mount Vernon custom of unlawful police conduct, let alone grounds to claim that
Mount Vernon was on notice of rampant police misconduct.  (Pls.' Mem. 13–14 (citing *Bancroft
v. City of Mount Vernon*, 672 F. Supp. 2d 391 (S.D.N.Y. 2009); *Lynch*, 567 F. Supp. 2d at 459;
and *Lewis v. City of Mount Vernon*, 984 F. Supp. 748 (S.D.N.Y. 1997)).)  This District did not
hold that there was a policy or custom that would satisfy *Monell* in any of these three cases.  In
*Bancroft*, the court dismissed all of the plaintiffs' claims, including their unreasonable search and
seizure claims, their excessive force claims, and their *Monell* claims.  *See Bancroft*, 672 F. Supp.
2d at 401–09.  In *Lynch*, the court granted the defendants' motion for summary judgment,
holding that there was no excessive force used and that the search warrant was supported by
probable cause.  *See Lynch*, 567 F. Supp. 2d at 463–70.  Finally, in *Lewis*, the court similarly
granted defendants' motion for summary judgment on the plaintiffs' Fourth Amendment claims.
*See Lewis*, 984 F. Supp. at 753–57.  Thus, though similar complaints may have been filed in the
cases cited by Plaintiffs, "none result[ed] in an adjudication of liability," according to Plaintiffs'
papers.  *Walker v. City of New York*, No. 12-CV-5902, 2014 WL 1259618, at *3 (S.D.N.Y. Mar.
18, 2014).  Even if the Court could consider these factual allegations made by Plaintiffs, they
would still not support a holding that Plaintiff plausibly pleaded the existence of a custom or
policy.  *See Collins v. City of New York*, 923 F. Supp. 2d 462, 479 (E.D.N.Y. 2013) (holding that
a "litany of other police-misconduct cases" discussed in the plaintiff's complaint "[were]
insufficient to make a plausible case for *Monell* liability" because they either were irrelevant to

the misconduct alleged in the case at hand, post-dated the alleged misconduct in the case at hand, or "involve[d] something less (settlements without admissions of liability and unproven allegations) than evidence of misconduct"); *Rasmussen v. City of New York*, 766 F. Supp. 2d 399, 409 (E.D.N.Y. 2011) ("The problem is that none of these facts show that there has been *any* violation of constitutional rights, so there is no evidence of the predicate fact underlying the alleged custom and policy.  [The] [p]laintiffs seem to proceed on the assumption that if a complaint, whether administrative or by way of a civil action, is filed against an officer, it follows *ipso facto* that he is guilty of a constitutional violation[.]").

The other assertions regarding a Mount Vernon custom or policy contained in Plaintiffs' Memorandum of Law in Opposition, even were they to be considered, fail for the same reason as do the assertions contained in the FAC.  They are conclusory allegations not entitled to the presumption of truth.  (*See, e.g.*, Pls.' Mem. 10 ("The City of Mt. Vernon does not have an official custom or policy that involved search warrants.  The Mt. Vernon Police are the ones that establish the Mt. Vernon custom and policy with regard to the application for and the execution of search warrants.  That is what at the least we have in the instant case.  A 'custom' adopted by the Mt. Vernon Police in search warrant cases, not to do further reasonable investigation as to the facts submitted to the [c]ourt prior to exercising the search warrant to [e]nsure reliability of the facts, and/or the informant who provided said information.  If this has [sic] been done in our case, I believe this warrant would never have been exercised."); *id.* ("On page 691 of *Monell*, it is clearly stated by the Supreme Court that governmental 'custom' may be the basis for a suit against a municipality for a violation of Plaintiffs' constitutional rights.  The violation facts [sic] are set out above, as is the custom of the Mt. Vernon Police."); *id.* at 11 ("A decision or action taken by officials responsible for establishing policy or custom with respect to search warrant

cases can be interpreted as establishing the policy of the City of Mt. Vernon. These Police

officers in the field can be deemed to be officials of the City when performing their work. These

acts by the Police officers as officials of the City established an uncodified practice so permanent

and well settled as to imply the constructive acquiescence of policy making officials of [t]he City

of Mt. Vernon." (citations and internal quotation marks omitted)); *id.* at 12 ("Members of the Mt.

Vernon Police are encouraged, and/or allowed by their supervisors to use coercive and

intimidating interrogation techniques, including threatening arrest of the suspect and family

members without fear of reprimand, discipline or even proper training or re-training. They are

also encouraged and allowed to conduct illegal, intrusive and excessive searches of civilians.").)

Plaintiffs' inadequate supervision claims also are conclusory and are not sufficient to

state a *Monell* claim. As noted above, a "municipality can be liable for failing to train its

employees where it acts with deliberate indifference in disregarding the risk that its employees

will unconstitutionally apply its policies without more training." *Amnesty Am. v. Town of W.

Hartford*, 361 F.3d 113, 129 (2d Cir. 2004) (citing *City of Canton*, 489 U.S. at 387–90).

"*Monell's* policy or custom requirement is satisfied where a local government is faced with a

pattern of misconduct and does nothing, compelling the conclusion that the local government has

acquiesced in or tacitly authorized its subordinates' unlawful actions." *Reynolds v. Giuliani*, 506

F.3d 183, 192 (2d Cir. 2007) (citing *Jett*, 491 U.S. at 737); *see also City of Canton*, 489 U.S. at

394–95 (O'Connor, J., concurring in part and dissenting in part) ("Where . . . a claim of

municipal liability is predicated upon a failure to act, the requisite degree of fault must be shown

by proof of a background of events and circumstances which establish that the 'policy of

inaction' is the functional equivalent of a decision by the city itself to violate the Constitution.").

However, such a failure to act, train, or supervise can constitute a municipal custom "only where

the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need." *Reynolds*, 506 F.3d at 192 (citing *City of Canton*, 489 U.S. at 390); *see also Marte v. N.Y.C. Police Dep't*, No. 10-CV-3706, 2010 WL 4176696, at *2 (S.D.N.Y. Oct. 12, 2010) (noting that a municipality's failure to train its employees can support § 1983 liability only where "'the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.'" (quoting *City of Canton*, 489 U.S. at 388)).

In *City of Canton*, the Supreme Court established the "deliberate indifference" standard in the context of a claim for failure to train, but "the stringent causation and culpability requirements set out in that case have been applied to a broad range of supervisory liability claims," including claims for failure to supervise and failure to discipline. *Reynolds*, 506 F.3d at 192 (citing *Amnesty Am.*, 361 F.3d at 127 (failure to supervise); *Berry v. City of Detroit*, 25 F.3d 1342, 1354 (6th Cir. 1994) (failure to discipline)); *see also Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011) (noting that "deliberate indifference" is a "stringent standard" requiring "proof that a municipal actor disregarded a known or obvious consequence of his action" (internal quotation marks omitted)).  Therefore, "where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a 'deliberate choice,' that acquiescence may 'be properly thought of as a city policy or custom that is actionable under § 1983.'" *Amnesty Am.*, 361 F.3d at 126 (some internal quotation marks omitted) (quoting *City of Canton*, 489 U.S. at 388); *see also Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995) (holding that a plaintiff "may establish the pertinent custom or policy by showing that the municipality, alerted to the [unconstitutional action by its employees], exhibited deliberate indifference"); *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 871 (2d Cir.

1992) (stating that municipal liability lies where the subordinate's misconduct is "so manifest as to imply the constructive acquiescence of senior policy-making officials").

The Second Circuit has set out three requirements that must be met before a municipality's failure to act constitutes deliberate indifference to the rights of citizens: first, that a policymaker knows "'to a moral certainty'" that his or her employees will confront a given situation; second, "'that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation;'" and third, "'that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.'" *Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007) (quoting *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992)) (some internal quotation marks omitted).  However, merely pleading the *Walker* requirements is insufficient.  To prove deliberate indifference for a failure to supervise or discipline claim, the plaintiff must "show that the need for more or better supervision to protect against constitutional violations was obvious, which may be established "by showing that there were repeated complaints of civil rights violations," and "deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents.  *Shepherd v. Powers*, No. 11-CV-6860, 2012 WL 4477241, at *9 (S.D.N.Y. Sept. 27, 2012) (internal quotation marks omitted).

Plaintiffs allegations regarding failure to supervise are as follows.  "As a result of the wrongful acts of [the Police Officer Defendants, Mount Vernon] is guilty of negligently supervising their employees causing . . . damage to Plaintiffs' property."  (FAC ¶ 36.) Additionally, Plaintiffs allege, "[i]nadequate supervision under §1983 is established by the facts that surround the acts by" Scott, Gallagher, Fox, Kushner, Cooper, Wilson, Azron, Kmiotek, and

58

Jane Doe.  (*Id.* ¶ 37.)  "The City of Mt. Vernon is liable under § 1983 and under New York Law for failing to properly supervise these named Police Officers[.]"  (*Id.* ¶ 39.)  It is clear that the sum total of these allegations is that Plaintiffs believe several law enforcement officials acted improperly during the search of Green's residence.  Yet, as noted, a single instance of unconstitutional conduct is not sufficient to make out a claim of an unconstitutional custom.  *See Tuttle*, 471 U.S. at 823–24 ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell* . . . ."); *Triano*, 895 F. Supp. 2d at 532 ("Normally, a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the municipality." (alteration and internal quotation marks omitted)).  Plaintiffs make no allegations that would allow the Court to plausibly infer that the need for more supervision was obvious and the inadequacy of the supervision was likely to result in the deprivation of federal rights.

For the above reasons, Plaintiffs have not pleaded facts sufficient to state a *Monell* claim against Mount Vernon.  Therefore, the Court grants Defendants' Motion To Dismiss all § 1983 claims against Mount Vernon.

### III.  Conclusion

For the foregoing reasons, Defendants' Motion To Dismiss is granted in part and denied in part.  In particular, the following claims are dismissed: the claims for unreasonable search and seizure, trespass, and false imprisonment/false arrest based on the search and detention of Green before Scott allegedly admitted to being in the wrong place; the unreasonable search claim based on the no-knock entry; the excessive force claim based on handcuffing; the excessive force claim based on the Defendant Police Officers entering with guns drawn; the negligent supervision claim; the intentional infliction of emotional distress claim against Mount Vernon; the negligent

59

infliction of emotional distress claim; and the *Monell* claim against Mount Vernon.  The Motion is denied as to all other claims.

The claims that are dismissed are dismissed with prejudice.  The Court has given Plaintiffs—who are counseled parties—four opportunities to amend their Complaint.  Moreover, the Court has given Plaintiffs specific instructions about the pleading requirements, which have been ignored.  Other than correcting typos, by the Court's review, the only change that has been made between the Third Amended Complaint, which was filed on December 20, 2012, and the Fourth Amended Complaint, filed on June 6, 2013, is the addition of ¶ 25, which discusses the Fegan Affidavit.  The only substantive change made between the Second Amended Complaint, filed on October 5, 2011, and the Third Amended Complaint was the addition of Defendant Police Officers' names.  This, despite the fact that this Court addressed specific deficiencies with counsel at the December 6, 2012 conference.  Thus, the Court finds that further opportunities for amendment would not be appropriate.  *See Best v. City of New York*, No. 12-CV-7874, 2014 WL 163899, at *3 (S.D.N.Y. Jan. 15, 2014) (dismissing claims with prejudice where the plaintiff "already amended his pleadings twice before" and did not correct errors identified by the court, reasoning that the "[p]laintiff ha[d] been given ample opportunity to amend his pleadings and the [c]ourt [could] only afford him so many bites at the apple"); *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 344 (S.D.N.Y. 2011) ("However, as [the] plaintiff has already amended his complaint twice, dismissal with prejudice is appropriate at this stage in the litigation."); *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 548 (S.D.N.Y. 2009) ("In light of the fact that the [complaint] constitutes [the] [p]laintiff's fourth attempt at pleading this matter, the dismissal is with prejudice."), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009); *see also Dyson v. N.Y. Health Care, Inc.*, 353 F. App'x 502, 503 (2d Cir. 2009) (holding that

"the district court did not abuse its discretion by dismissing [the plaintiff's] third amended complaint with prejudice" where the plaintiff ignored the court's instructions to plead sufficient facts to state a plausible claim); *Ercole v. LaHood*, No. 07-CV-2049, 2011 WL 1205137, at *15 (E.D.N.Y. Mar. 29, 2011) (collecting cases), *aff'd*, 472 F. App'x 47 (2d Cir. 2012).

The Clerk of the Court is respectfully directed to terminate the pending Motion.  (*See* Dkt. No. 51.)

SO ORDERED.

Dated:      March 31, 2015
            White Plains, New York

_____
KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

61